# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued January 8, 2016          Decided May 20, 2016

No. 15-5034

PRINCE JOHNSON,
APPELLANT

v.

THOMAS E. PEREZ, SECRETARY, DEPARTMENT OF LABOR,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-01832)

*Rani Rolston* argued the cause for appellant. On the brief was *Alan Lescht*.

*Damon W. Taaffe*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Vincent H. Cohen, Jr.*, Acting U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: TATEL and PILLARD, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*: Prince Johnson, an African American temporary employee of the U.S. Department of Labor, sued the Department, claiming that it dismissed him from his position as a Veterans Employment Specialist because of his race in violation of Title VII. The district court saw grounds to doubt the Department's stated justifications for Johnson's dismissal, but granted summary judgment to the Department for want of evidence of racial discrimination. We affirm on the slightly different ground that, on the evidentiary record, no reasonable juror could find that the Department's stated, nondiscriminatory reasons for dismissing Johnson were not its real reasons.

**I.**

In April 2006, the Department of Labor hired Johnson as a Veterans Employment Specialist within the Veterans Employment and Training Services (VETS) division.[1] The Director of Operations and Programs, Gordon Burke, recruited Johnson, a former Army Captain, and hired him into a noncompetitive position for qualified veterans with service-related disabilities. *See* 5 U.S.C. § 3112; 5 C.F.R. § 316.402(b)(4). The post was a temporary one with a possibility of permanent employment. 5 U.S.C. § 3112; 5 C.F.R. § 316.402(b)(4). Pamela Langley, the Division Chief of the Employment and Training Programs Division within VETS, also interviewed Johnson and reviewed his application. Langley then became Johnson's direct

---

[1] The statement of facts is taken from the record evidence submitted in support of the parties' summary judgment briefing. Some of the facts reported here are disputed, but our obligation at the summary judgment stage is to view all facts in the light most favorable to the nonmoving party, here the plaintiff. Facts unfavorable to him that are included are those that Johnson has not factually controverted.

supervisor. Director Burke, like Johnson, is African American, and Division Chief Langley is white.

Johnson's career at VETS was short lived. He held the position on a temporary basis, with an extension, for approximately six months before Director Burke terminated his appointment. To Johnson, the new job was a frustrating disappointment. Johnson testified at his deposition that he had assumed he would be given adequate time and training to learn the skills the position required; instead, he felt, he was "set up to fail." J.A. 192. His supervisors struck him as unfriendly and unreceptive. Johnson's coworkers told a similar story: They told Johnson or averred in connection with discovery in this case that they observed supervisors talk down to Johnson, yell at him, and call him "stupid" or "useless." J.A. 293, 298. One co-worker found Division Chief Langley "demeaning" in her interactions with Johnson, J.A. 45, another described a general attitude of disrespect toward minority employees within the office, and another observed instances in which Langley or Patrick Hecker, the VETS "Jobs for Veterans" State Grants Lead and a white male, yelled at Johnson.

Johnson's primary responsibility was to assist Hecker to create and update spreadsheets tracking information in the "Jobs for Veterans" grants program that VETS administered. He also worked with Ed Davin, a Performance Specialist on contract to VETS. Burke, Langley, Hecker, and Davin all perceived Johnson as struggling to complete the tasks assigned to him. According to their accounts, they clarified what was expected, identified specific deficiencies, and explained how he could correct them. They authorized Johnson to spend some time at a VETS State Local Office in Maryland to learn more about how the program worked in practice, and they arranged for VETS to sponsor Johnson for

training to upgrade his relevant skills. In the face of some disagreement from Johnson about which courses would be most appropriate, the supervisors authorized him to take an Excel training course and sent him to a training conference in Chicago.

Despite what management characterized as efforts to make Johnson's employment work out, in October 2006, Division Chief Langley recommended to Director Burke that Johnson's probationary appointment be terminated. As Langley recounts the situation, her own observations of Johnson's work and the reports of his direct supervisors persuaded her that he should not remain in the position. Langley notified Johnson that she was going to recommend termination of his employment at VETS for failure to perform satisfactorily and for his "unacceptable attitude" when advised of errors in his work product. J.A. 221. Burke agreed with Langley's recommendation. He recounted that he terminated Johnson "based on [his] own dissatisfaction with [Johnson's] argumentative demeanor and his reported lack of performance and argumentative character." J.A. 207. In the Termination Memorandum Burke issued to Johnson, he outlined the requirements of Johnson's position and then listed the ways in which Johnson's performance had been deficient: He had "not completed satisfactorily" the projects he had been assigned and had shown an "argumentative response and demeanor" when confronted with his poor work. J.A. 473.

After exhausting his administrative remedies, Johnson brought suit in district court, alleging that he was subjected to a hostile work environment based on his race, and that his termination was racially discriminatory in violation of Title VII. Following discovery, the district court granted summary judgment to the government on both claims. *Johnson v.*

*Perez*, 66 F. Supp. 3d 30, 45-46 (D.D.C. 2014). The Department moved this court for summary affirmance. The court granted the Department's motion in part, affirming judgment on the hostile work environment claim on the ground that, as a matter of law, the incidents Johnson identified in support of that claim "were not 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Johnson v. Perez*, No. 15-5034, 2015 WL 5210265 (D.C. Cir. July 1, 2015) (per curiam) (quoting *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21 (1993)). The panel denied summary affirmance as to the discriminatory discharge claim, *id*., which was then calendared for full briefing and argument to this panel.

## II.

We review a district court's grant of summary judgment *de novo*. *Calhoun v. Johnson*, 632 F.3d 1259, 1261 (D.C. Cir. 2011). By the time a party files a summary judgment motion, all parties should have had the opportunity to investigate the case thoroughly and should have done so. In making or opposing a summary judgment motion, a party may no longer rely on the hope of new testimony or additional documents other than what it put before the court. Each party's hand is dealt. The task of the court is to review the factual material the parties present in support of and opposition to the motion, in light of the parties' legal claims and defenses, and assess whether the record contains disputes calling for resolution by a factfinder. In considering a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party (here, Johnson) and draws all reasonable inferences in his favor. *Id*. The court may not make credibility determinations or otherwise weigh the evidence. *Id.* The court may not, for example, believe one witness over

another if both witnesses observed the same event in materially different ways. But if one party presents relevant evidence that another party does not call into question factually, the court must accept the uncontroverted fact.

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). That can be the case when, for example, the parties agree about the facts—what happened—and the court accepts the movant's view of the legal implications of those facts, or, as in this case, when a putatively disputed body of evidentiary material could not, even assuming a sympathetic factfinder, reasonably support a finding crucial to the nonmoving party's legal position. A dispute about a material fact is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). In that circumstance, the summary judgment motion must be denied. *Id.* A moving party is entitled to judgment, however, if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Title VII prohibits federal agencies from discriminating against their employees on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-16(a). Federal employees' Title VII claims, although authorized by a separate statutory section, are analyzed in the same way as Title VII claims against private employers. *See, e.g*., *Borgo v. Goldin*, 204 F.3d 251, 255 n.5 (D.C. Cir. 2000). Under the burden-shifting framework of *McDonnell Douglas*, a Title VII plaintiff seeking to prove disparate treatment through indirect, circumstantial evidence "must first establish a *prima facie*

case of prohibited discrimination." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Once the plaintiff has done so, the burden then shifts to the defendant to "articulate legitimate, nondiscriminatory reasons for the challenged employment decision." *Aka*, 156 F.3d at 1288.

The Department's position is that it terminated Johnson because his performance was deficient and his demeanor was argumentative in response to supervisor feedback. At summary judgment, when an employer has offered a legitimate, non-discriminatory reason for the challenged termination, as the Department has done in this case, the court's inquiry turns to "one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). In the posture in which this case comes to us, our focus is on whether a jury, looking at the record evidence and drawing all inferences in Johnson's favor, could conclude that Johnson's race was "a motivating factor" for the discharge. 42 U.S.C. § 2000e-2(m).

Johnson has failed to identify record evidence from which a reasonable jury could conclude that race played a role in his discharge. Had Johnson been able to show that Burke gave conflicting justifications for his recommendation, or that the reasons he gave were not credible based on the underlying facts of Johnson's job performance, Johnson might have raised a material factual dispute. For example, evidence that similarly-situated, non-black employees with comparable

performance deficits were not fired was what sufficed in *Wheeler v. Georgetown University Hospital*, 812 F.3d 1109, 1115 (D.C. Cir. 2016), to create a triable factual dispute about the employer's assertedly nondiscriminatory reliance on plaintiff's poor job performance. In *Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1084 (8th Cir. 2013), plaintiff's evidence that he was meeting his employer's expectations up to the time of termination, and that the employer's response to his alleged insubordination was unduly harsh when measured under the employer's own general policy and practice of responding to such problems, sufficed to create material factual disputes about the employer's invocation of performance and behavior problems. And in the case perhaps most akin to this one, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 394-95 (6th Cir. 2008), evidence that plaintiff's educational and experiential qualifications were superior to those of the candidate offered the promotion plaintiff sought provided context for the employer's reliance on an "inherently subjective determination" of applicant's "aggressive" interview demeanor—a factor "easily susceptible to manipulation"—and sufficed to create a material factual dispute whether the employer's assertions were a pretext for racial discrimination. This record, however, does not present evidence from which a reasonable jury could find either that Johnson's job performance was better than the Department claims, or that his supervisors' stated concerns about Johnson's unresponsiveness to constructive criticism are unworthy of credence.

The Termination Memorandum Burke issued to Johnson explained that he recommended dismissal because Johnson had failed to "[m]aintain accountability over projects commensurate with [his] level of responsibility," had been unable "to accomplish routine tasks on a reoccurring [sic] basis under [his] own initiative," and had not "[i]nterface[d]

positively with fellow staff members and [his] supervisor." J.A. 473. Burke gave no conflicting justifications for his decision. In ensuing explanations, Burke sometimes emphasized one reason more than the others, but he gave no contrary account of Johnson's job performance, nor any other, conflicting reason.

All of the record evidence memorializing Burke's justifications for terminating Johnson is consistent. The record of Burke's interview with an Equal Employment Opportunity Counselor, Burke's affidavits of April 2007 and August 2007, and Burke's July 2012 deposition reflect a decision based on Johnson's failure to do the job proficiently and his resistance to feedback when his supervisors tried to work with him to improve. In an interview with an Equal Employment Opportunity Counselor, Burke explained that "Johnson [could not] do the work." J.A. 482. In an affidavit dating from April 2007, Burke explained both that Johnson had been unable to complete the assigned work and that Burke had been dissatisfied with Johnson's demeanor. In an August 2007 affidavit, Burke again noted Johnson's argumentative and disruptive behavior with supervisors. Finally, in his July 2012 deposition, Burke explained, "Johnson was terminated because he could not perform the requirements of the job position and because of his inability to get along with peers and superiors characterized by an argumentative demeanor." J.A. 98.

Johnson attempts to show contradiction by pointing to the Department's answer to Johnson's complaint, which admitted that "Mr. Burke stated that he terminated Mr. Johnson to support the supervisor and because Mr. Johnson could not perform the work," but denied that those statements were conflicting. J.A. 27. Johnson sees a conflict between Burke's two bases but, as the district court noted, "it stands to reason

that a part of Burke's support for Johnson's supervisor (Langley) might very well be support for her assessment that Johnson was unable to do the work required for his position in a timely fashion and without errors." *Johnson*, 66 F. Supp. 3d at 39. There is no contradiction between acting in support of another manager's assessment of an employee under her supervision and acting based on the factual accuracy of that assessment.

Nor is there any evidence calling into question the factual basis for Burke's conclusion that Johnson's job performance was inadequate. Johnson attempts to show that he performed well at his job and that he did not have an argumentative demeanor. Neither attempt to call Burke's justifications into question raises a genuine issue of material fact.

First, although there is record evidence that Johnson performed well in some areas, there is no evidence contradicting Burke's conclusion that Johnson could not perform his assigned tasks at the level expected of someone in his role. Johnson's evidence consists of (1) statements of his non-supervisory colleagues, Angela Freeman and Loretta Alston; and (2) an affidavit of team leader Hecker. None of those witnesses' accounts raises a material factual dispute about Burke's justifications.

The accounts of Johnson's colleagues, Freeman and Alston, fail materially to dispute Burke's justifications. Angela Freeman, a Management Analyst and the leader of a team that worked with Johnson's, averred, "Given my grade I was never in the position to assign Mr. Johnson work, however as [stated] above he and I often teamed up [to] complete various projects within the agency. The instances in which Mr. Johnson assisted me with the completion of a project I observed his work to [be] excellent and extremely

timely in manner." J.A. 298. Because Freeman never supervised or even saw the work that Johnson did on his own, her statements cannot call into question Burke's conclusion that Johnson was not sufficiently accurate, timely, and accountable for his assigned tasks.

Loretta Alston, also a Management Analyst and another of Johnson's co-workers, testified "I don't know" how well Johnson did his job. J.A. 35. But she said that when Johnson showed her "how to do the spreadsheets" he "was very competent." J.A. 36. Like Freeman, Alston was not in a position to judge how quickly or accurately Johnson performed on the tasks that the program's management assigned to him. That Johnson appeared competent to Alston while he trained her does not call into question Burke's conclusion that Johnson persistently failed, in Burke's own view and that of Johnson's other supervisors, to complete his work without error or delay.

Finally, the affidavit of team leader Hecker, with whom Johnson was assigned to work directly, supports Burke's conclusions without contradiction. Hecker noted that Johnson "worked well when assigned to coordinate and interact with others to complete an assignment." J.A. 231. "[H]owever," Hecker stated, "the majority of the work was individual work and involved information or data which had to be entered into spreadsheets or other automated and internet based systems. . . . Often the spreadsheets that [Johnson] created or modified contained easily identified errors when reviewed." *Id.* Hecker also noted Johnson's failure to complete projects on deadline, *id.* at 231-32, and his lack of the "knowledge or organizational skills required of the position," *id.* at 231. Hecker's affidavit is fully consistent with Burke's conclusion that Johnson was unable to complete his work on his own.

Nor has Johnson presented any evidence calling into question Burke's conclusion that Johnson was argumentative in his interactions with his supervisors. The accounts of Johnson's supervisors support Burke's conclusion. Hecker, who had a quasi-supervisory relationship to Johnson, averred that when he tried to bring Johnson's "marginal work" to his attention, Johnson "would become defensive." J.A. 232. Johnson's first-line supervisor, Langley, also found Johnson argumentative. Langley testified: "It seemed to me that at times he was argumentative, particularly when I requested that he change something or . . . when I identified that there was a deficiency in what he had provided me, he would become argumentative in responding . . . . So in that way he was argumentative. He didn't seem to accept criticism of his work, constructive criticism of his work." J.A. 124-25.

That Burke in the internal EEO process described Johnson as a "good guy" who got along well with his colleagues, J.A. 482, does not contradict Burke's conclusion that Johnson dealt poorly with criticism of his work and responded defensively and argumentatively. In Burke's own interactions with Johnson, Burke recounted, Johnson "was argumentative with [him] on three occasions where [Johnson] was actually in [Burke's] office to discuss performance." J.A. 99.

Critically, the evidence Johnson puts forward in an effort to call into question Burke's justification comes from colleagues who provide no reason to believe that they were Johnson's supervisors, were in a position to assess his work product, or had firsthand experience trying to give Johnson feedback on his work. Johnson's colleagues Alston, Jenel Turner, and Linda Chambers all averred that they never saw Johnson being argumentative at work. But Burke did not terminate Johnson on the ground that Johnson was generally

argumentative in the office or failed to get along with his office peers; there is no dispute that Johnson was affable and agreeable to his peers at work. *See, e.g.*, J.A. 482. Rather, Burke's justification was the compound difficulty that Johnson's work was deficient and that he reacted with an "argumentative response and demeanor" when supervisors sought to address his work deficiencies. J.A. 473. The accounts of his colleagues, who did not interact with Johnson in a supervisory relationship or purport to have observed such interactions, do not address the quality of his work and do not suffice to controvert the testimony of his supervisors so as to create a genuine factual dispute whether Johnson was argumentative and defensive when confronted with feedback.

In sum, Johnson has not presented evidence from which a reasonable jury could conclude that the nondiscriminatory reasons Burke gave for terminating Johnson's employment were not his real reasons. The record evidence does not show that Burke gave conflicting justifications or that Burke's justifications were unsupported by the underlying facts of Johnson's employment. Johnson rests his case on a pretext theory and has not identified other types of evidence—such as direct evidence, evidence of similarly-situated employees who were treated better than he was, or other forms of circumstantial evidence—tending to show that race was a motivating factor.

Because the record could not support a finding that the Department's justifications for terminating Johnson were pretext, the Department is entitled to summary judgment.

## III.

Finally, we offer brief clarification on three points of potential confusion. First, it is somewhat unusual for a court to find—as the district court did here—that there is a triable

issue as to pretext, but no triable issue as to discrimination. The district court found that there was "arguably a genuine dispute of fact about Plaintiff's job performance and workplace demeanor and, thus, whether Defendant's proffered reasons for terminating Johnson were pretextual." *Johnson*, 66 F. Supp. 3d at 41. The court nonetheless granted summary judgment to the Department on the ground that Johnson had not introduced evidence that the employer's potentially pretextual reasons were a mask for racial discrimination. *Id.* To be sure, some summary judgment records—including, in the district court's view, this one—would permit a jury to find that an employer's reasons are false, yet could not support a reasonable inference of discrimination. *See generally St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 508-09 (1993) (sustaining determination that defendants' proffered reasons were not the real reasons for the challenged demotion and discharge, but that plaintiff failed to show racial motivation). The legal permissibility of such a disposition, however, should not be taken to suggest that a successful showing of pretext, without more, is necessarily inadequate to support an inference of unlawful racial discrimination. "In an appropriate case, '[t]he factfinder's disbelief of the reasons put forward by the defendant' will allow it to infer intentional discrimination." *Aka*, 156 F.3d at 1294 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 511). In such a case, "[n]o additional proof of discrimination is required." *St. Mary's Honor Ctr.*, 509 U.S. at 511 (quoting *Hicks v. St. Mary's Honor Ctr.*, 970 F.2d 487, 493 (8th Cir. 1992)) (internal quotation marks and emphasis omitted). Neither the district court's opinion nor ours should be read to suggest otherwise.

Second, in the course of explaining that Johnson had failed to show that Burke's proffered reasons for firing Johnson were contradictory, the district court noted that

Johnson's only evidence was his own testimony that Burke had originally claimed he was firing Johnson to support Langley. In addition to rejecting that testimony for the reason we cited above—it failed to show any inconsistency—the court stated that "[s]uch self-serving testimony is insufficient to create a genuine issue of material fact regarding whether an employer's proffered reason for termination was pretextual." *Johnson*, 66 F. Supp. 3d at 39. Relying on earlier district court opinions, the district judge stated that "[s]elf-serving testimony does not create genuine issues of material fact, especially where that very testimony suggests that corroborating evidence should be readily available [but is absent]." *Johnson*, 66 F. Supp. 3d at 39. But as we have explained since the earlier district court decisions, "there is no rule of law that the testimony of a discrimination plaintiff, standing alone, can never make out a case of discrimination that could withstand a summary judgment motion." *Desmond v. Mukasey*, 530 F.3d 944, 964 (D.C. Cir. 2008) (quoting *George v. Leavitt,* 407 F.3d 405, 414 (D.C. Cir. 2005)) (internal quotation marks omitted). After all, evidence a party proffers in support of its cause will usually, in some sense, be "self-serving." It is nonetheless beyond question as a general proposition that parties, like other fact witnesses, are legally competent to give material testimony. Indeed, in many kinds of cases, parties are the key, or even sole, witnesses. To the extent the testimony of a witness who is also a party may be impaired by party self-interest, it is ordinarily the role of the jury—not the court on summary judgment—to discount it accordingly. *See, e.g*., *George*, 407 F.3d at 413-14.

Third, the district court reasoned that "unsubstantiated co-worker testimony alone is generally insufficient to raise a question of material fact regarding pretext at the summary judgment stage." *Johnson*, 66 F. Supp. 3d at 42. But the co-workers' accounts that Johnson offered to show that he was

treated more harshly than white employees were insufficient not because they were the unsubstantiated testimony of co-workers, but because their statements either were too general to controvert the employer's particular concerns about Johnson's job performance or spoke to aspects of Johnson's work other than what the supervisors identified as deficient, or both. Courts may grant summary judgment to a defendant where a plaintiff's evidence is vague or conclusory. *See, e.g.*, *Ransom v. Ctr. for Nonprofit Advancement*, 514 F. Supp. 2d 18, 27 (D.D.C. 2007) (rejecting on summary judgment plaintiff's "vague and conclusory" allegation of discrimination); *Chung v. Wash. Metro. Area Transit Auth.*, No. 04-0366, 2007 WL 1154084, at *3 (D.D.C. Apr. 18, 2007) (concluding affidavits too vague to be probative), *aff'd*, 268 F. App'x 6 (D.C. Cir. 2008); *Carter v. Rubin*, 14 F. Supp. 2d 22, 42 (D.D.C. 1998) (concluding deposition testimony and affidavits lacked requisite specificity). But determining whether a co-worker's specific and relevant, if uncorroborated, testimony is trustworthy is a credibility determination reserved for the jury.

\*\*\*

For the foregoing reasons we affirm the decision of the district court.

*So ordered*.