# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 21, 2016          Decided February 17, 2017

No. 15-7144

UNITED STATES, EX REL. JULIE MCBRIDE,
AND
JULIE MCBRIDE,
APPELLANT

LINDA WARREN AND DENIS MAYER,
APPELLEES

v.

HALLIBURTON COMPANY, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:05-cv-00828)

*Victor Aronoff Kubli* argued the cause and filed the briefs for appellant.

*Joshua S. Johnson* argued the cause for appellees Halliburton Company, et al. With him on the brief were *John P. Elwood*, *Tirzah S. Lollar*, and *John M. Faust*. *Craig D. Margolis* entered an appearance.

Before: KAVANAUGH and WILKINS, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: Relator-Appellant Julie McBride ("McBride") appeals the District Court's grant of summary judgment in favor of Defendants-Appellees Halliburton Company; Kellogg Brown & Root, Inc.; Service Employees International Inc.; Kellogg Brown & Root Services, Inc.; and KBR Technical Services, Inc. (collectively, "KBR"). McBride asserted violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729(a), based on KBR's alleged inflation of "headcount" data – which purported to track how many U.S. troops frequented KBR's recreation centers at certain camps in Iraq – from July 2004 to March 2005. The District Court granted summary judgment for KBR, concluding that McBride failed to offer evidence that any misrepresentation regarding headcount data (if one existed) was material to the Government's decision to pay KBR. We agree; and, taking into account the Supreme Court's intervening decision in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016), we affirm.

## I.

### A.

Under the Logistics Civil Augmentation Program ("LOGCAP"), the U.S. Army contracts with private companies to provide a wide range of logistical services. In 2001, the Army awarded KBR the third contract issued under the LOGCAP program, known as "LOGCAP III."[1] LOGCAP III

_____

[1] We refer to Appellees collectively but note that Kellogg Brown & Root Services, Inc. ("KBRSI") is the only Appellee that was a party

did not specify the particular work to be performed by KBR. Instead, KBR's contractual responsibilities were set forth in individual "Task Orders."

The Task Orders used a cost-plus-award-fee structure, *see* 48 C.F.R. § 16.405-2, meaning KBR received reimbursement for the actual costs of the services provided,[2] as well as a "base fee" of 1% of the pre-determined estimated cost of performing the services under the Task Order. At the Government's discretion, KBR could also earn an "award fee" of up to 2% of the estimated cost based upon better than average performance.

Shortly after the U.S. military's March 2003 invasion of Iraq, KBR began providing services under Task Order 59, which was effective from June 2003 to May 2005. Task Order 59 required KBR to provide a wide range of support services for U.S. troops, such as camp construction, power generation, dining facilities, potable and non-potable water services, fire protection, laundry, and – relevant here – morale, welfare, and recreation ("MWR") services. KBR performed MWR services by maintaining recreation centers where U.S. troops could exercise, play games, watch television, and use the internet, among other things. MWR services were a relatively small part of KBR's overall effort, representing about 1.5% of total costs incurred under Task Order 59.

From November 2004 to March 2005, McBride worked for KBR as one of ten employees at the MWR facilities at

_____

to the LOGCAP III contract, and the only one that submitted bills to the Government under that contract.

[2] KBR was entitled to bill for its allowable costs – *i.e.*, costs that were reasonable, allocable to its contract, subject to proper accounting, and in compliance with contractual terms and any limitations set forth in 48 C.F.R. subpart 31.2. *See* 48 C.F.R. §§ 31.201-2 to 31.201-4.

Camp Fallujah (also known as Camp B-3) in Iraq. McBride's duties included ensuring that soldiers who entered the MWR facilities signed in to use them. According to McBride, during the night shift she had the additional responsibility of compiling "headcount" data which purported to reflect how many troops had used the facilities each day. McBride assembled this data in "Situation Reports" or "Sit Reps," and distributed them to KBR personnel.

This case centers on McBride's allegation that KBR inflated the headcount data, reflecting inaccurate headcount numbers for MWR facilities at Camp Fallujah and Camp Ar Ramadi (also known as Camp B-4) from July 2004 to March 2005. McBride alleges various ways in which the headcount data was inflated, such as counting soldiers each time they entered different parts of the facilities. McBride also alleges that KBR destroyed sign-in sheets to conceal the falsity of the headcount data, and that KBR stopped inflating headcounts after she reported the practice to her supervisors.

Although McBride has not consistently articulated a precise theory, her basic contention is that KBR failed to disclose violations of its obligations to maintain accurate data to support its costs, and as such, rendered its claims impliedly false.

**B.**

McBride filed this case under seal in April 2005. The District Court unsealed it in July 2006 after the Government declined to intervene. In October 2006, before KBR was served with the Complaint, the Defense Contract Audit Agency ("DCAA") investigated McBride's allegations, issuing written questions to KBR and visiting Camp B-3 to review records and interview KBR's personnel. The DCAA did not issue any

formal findings, but neither DCAA nor any other Government agency disallowed or challenged any of the amounts KBR had billed for MWR services under Task Order 59.

After the District Court unsealed the case, KBR moved to dismiss. The District Court permitted two of McBride's claims to go forward to discovery, including one based on her core assertion that KBR had used false MWR headcount tallies to overbill the Government. KBR then moved for summary judgment, arguing that the contract documents established that they did not charge the Government for MWR services on a "per head" basis. The District Court denied that motion without prejudice pending discovery.

For the next three years, KBR produced over two million pages of documents, conducted Rule 30(b)(6) depositions of the Army, and deposed McBride. McBride took no fact depositions. Discovery neared a close and the parties became embroiled in a dispute as McBride attempted to expand her claims to cover a broader time period and additional camps in Iraq. KBR moved for a protective order to limit any remaining discovery, and the District Court provided McBride with the opportunity to file a fourth amended complaint to articulate the scope of her claims as she saw them. McBride declined those offers because, in counsel's view, there was "no legal need to do so." J.A. 270. The District Court granted KBR's motion for a protective order; and discovery closed after McBride took KBR's Rule 30(b)(6) deposition in February 2013.

KBR then filed a motion for summary judgment. In a Memorandum-Decision and Order dated May 27, 2014, the District Court granted in part and denied in part KBR's motion for summary judgment. The District Court denied KBR's motion with regard to McBride's claims insofar as they were based on her allegations that KBR inflated the headcount of

patrons using MWR facilities at Camps B-3 and B-4 from July 2004 to March 2005. The very next day, the District Court permitted KBR to file a motion for reconsideration, instructing McBride to provide it with a proffer of evidence.

On December 10, 2014, the District Court granted KBR's motion for reconsideration, and granted its motion for summary judgment. The District Court expressed doubt that there was anything "unreasonable or inherently false or fraudulent about [KBR's alleged] method of accounting for the usage of . . . different [MWR] services," but in any event concluded that KBR was entitled to summary judgment because McBride had presented no evidence that the alleged headcount practices were material to the Government's payment decisions. Mem. Decision & Order, No. 05-cv-828, at 16-18, 16 n.3 (D.D.C. Dec. 10, 2014), J.A. 416-18.

## II.

We review the District Court's grant of summary judgment *de novo*. *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Johnson v. Perez*, 823 F.3d 701, 705 (D.C. Cir. 2016). "[T]he mere existence of *some* alleged factual dispute between the parties" is not enough to defeat summary judgment; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

**III.**

McBride brings two claims under the FCA, invoking Sections 3729(a)(1) and 3729(a)(2).[3] Section 3729(a)(1) creates liability for any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1) (2006). Section 3729(a)(2) creates a cause of action against anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." *Id.* § 3729(a)(2).

Both provisions – subsections (a)(1) and (a)(2) – require a "false or fraudulent claim" for payment; however, the statute does not define what makes a claim "false" or "fraudulent." In *United States v. Science Applications International Corp. (SAIC)*, 626 F.3d 1257 (D.C. Cir. 2010), we observed that, "[i]n the paradigmatic case, a claim is false because it 'involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided.'" *Id.* at 1266 (quoting *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001)). Alternatively, a plaintiff may proceed under the so-called "certification" theory of liability, which forms the basis for McBride's claims in this case. Under this theory, the falsity of a claim for payment "rests on a false representation of compliance with an applicable federal statute, federal regulation, or contractual term." *Id.* In *SAIC*, we explained that courts may "infer implied certifications from silence"

---

[3] This opinion refers only to the FCA's pre-2009 text. Congress amended the FCA by enacting the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21, 123 Stat. 1617. The parties agree that the post-FERA version of the statute does not apply retroactively to McBride's claims.

under certain circumstances, *id.*, but in order to establish liability the plaintiff must prove that "compliance with the legal requirement in question is *material* to the government's decision to pay," *id.* at 1271 (emphasis added). We committed to "enforcing this [materiality] requirement rigorously" to "ensure that government contractors will not face onerous and unforeseen FCA liability as the result of noncompliance with any of potentially hundreds of legal requirements established by contract." *Id.* (internal quotation marks omitted).

After McBride filed her opening brief, and before KBR responded, the Supreme Court issued its decision in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016), which endorsed an "implied false certification" theory under certain circumstances. Specifically, the Court held that "[w]hen . . . a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided."[4] *Id.* at 1999. The Court made clear that courts should continue to police expansive implied certification theories "through strict enforcement of the Act's materiality and scienter requirements." *Id.* at 2002 (quoting

---

[4] The Supreme Court left open the question of whether a claim that "merely demand[s] payment," as opposed to one that makes specific representations about the goods or services provided, can count as the requisite misleading representation. *Universal Health*, 136 S. Ct. at 2000; *see also id.* (claims with treatment- and specialty-specific payment codes made representations that healthcare provider had provided particular types of therapy by licensed professionals, and were "clearly misleading" in context where provider failed to disclose "many violations of basic staff and licensing requirements for mental health facilities"). We need not grapple with that question here because the lack of materiality is clearly dispositive.

*SAIC*, 626 F.3d at 1270). In particular, "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act."[5] *Id.*

The Supreme Court offered "clarif[ication]" as to how the "familiar and rigorous" materiality standard should be enforced, *id.* at 2002, 2004 n.6, including that courts should look beyond the express designation of a requirement as a condition of payment to find it material, *id.* at 2003 ("[T]he Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive."). Additionally, courts need not opine in the abstract when the record offers insight into the Government's actual payment decisions. *See id.* at 2002 ("Under any understanding of the concept, materiality 'look[s] to the effect on the likely or *actual* behavior of the recipient of the alleged misrepresentation.'" (alteration in original) (emphasis added) (quoting 26 RICHARD A. LORD, WILLISTON ON CONTRACTS § 69:12 (4th ed. 2003))). The Supreme Court made clear the materiality standard is "demanding," *id.* at 2003, and not "too fact intensive" to resolve on a motion for summary judgment, *id.* at 2004 n.6.

---

[5] In *Universal Health*, although some of the claims were submitted prior to FERA's enactment in 2009, the Supreme Court considered the post-FERA version of the FCA. The defendant did not argue, and thus the Court "d[id] not consider, whether pre-2009 conduct should be treated differently." *Universal Health*, 136 S. Ct. at 1998 n.1. Here, we assume – as the parties have done – that *Universal Health*'s materiality standard applies to the instant dispute. We need not decide whether (or how) that standard may differ from the one we used prior to *Universal Health*.

**IV.**

Turning to McBride's claims, to successfully oppose summary judgment, McBride must show that a reasonable factfinder, drawing all justifiable inferences from the evidence in her favor, could find that KBR violated a contractual or regulatory requirement that was material to the Government's decision to pay. *See United States ex rel. Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19, 29 (D.C. Cir. 2014). In doing so, she "cannot rely on the allegations of her own complaint . . . , but must substantiate them with evidence." *Grimes v. District of Columbia*, 794 F.3d 83, 94 (D.C. Cir. 2015).

We begin by isolating the purported violation of a contractual, regulatory, or other legal requirement that KBR allegedly failed to disclose. McBride stakes her claims on KBR's maintenance of false headcount data. Neither LOGCAP III nor Task Order 59 specifically required MWR headcount data to be maintained by KBR, much less produced to the Government. It appears KBR voluntarily undertook to track this data and, at times, provided it to the Government.[6]

Instead, McBride finds her foothold in the Federal Acquisition Regulation ("FAR") which provides that the costs charged to the Government must be "[r]easonable[]." 48 C.F.R. § 31.201-2(a)(1). "A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business." *Id.* § 31.201-3(a). "What is reasonable depends upon a variety of considerations and circumstances, including[,] [*inter alia*] –

---

[6] For example, KBR provided the Government with Logistic Reports ("Log Reps"), which included aggregate MWR headcount data across several camps in Iraq.

[w]hether it is the type of cost generally recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance." *Id.* § 31.201-3(b).

The FAR also holds KBR "responsible . . . for maintaining records, including supporting documentation, adequate to demonstrate that costs claimed have been incurred, are allocable to the contract, and comply with applicable cost principles. . . ." *Id.* § 31.201-2(d). The Government is entitled to disallow costs that are determined to be unreasonable or unsubstantiated by supporting documentation. *Id.* § 31.201-2. McBride refers to these and other FAR requirements as relevant to her claims, and in doing so, appears to shift between imprecise theories about unreasonable costs and faulty supporting documentation.[7]

Specifically, McBride alludes to the possibility that KBR may have used inflated headcounts to justify excessive staffing levels at its MWR facilities, and that as a result, personnel costs were unreasonable; but McBride does not actually set out to prove that staffing was excessive or costs were "unreasonable."[8] Instead, her primary contention is that KBR deprived the Government of the opportunity to examine

---

[7] McBride performed similar maneuvers in the District Court, where she initially obfuscated her way through summary judgment before the District Court reconsidered its decision. *See* Mem. Decision & Order, No. 05-cv-828, at 10 (D.D.C. Dec. 10, 2014), J.A. 410 ("One of the reasons that the Court granted Defendants' motion for reconsideration is that it has been difficult for the Court to get Relator McBride's counsel to articulate the nature of his client's claims in a consistent and precise manner.").

[8] To be sure, McBride also does not contend there were any falsities in KBR's payment invoices, and acknowledges that all costs claimed were costs actually incurred for hours that personnel actually worked.

records in order to determine the reasonableness, or allowability of the costs. The assumption, of course, is that accurate headcount data was relevant to determining the reasonableness of costs. However, she offers no evidence in support of that proposition other than her own say-so, which is clearly insufficient. *See Grimes*, 794 F.3d at 94 ("[I]t is well established that [a plaintiff] cannot rely on the allegations of her own complaint in response to a summary judgment motion, but must substantiate them with evidence.").

Indeed, when pressed by the District Court on this issue, McBride's counsel disclaimed the need for evidence because he was "resting on the proposition that what it takes to service five people is a lot less than what it takes to service 500 people." J.A. 391; *see also* McBride Opening Br. 22 n.6 (reiterating same). Although there is some intuitive attraction to counsel's logic, it is irrelevant here. To the contrary, KBR proffered evidence that when it first began work under Task Order 59, it had no headcount data to extrapolate from for staffing decisions because none yet existed; as such, in accordance with a military manual governing a prior conflict area, KBR determined staffing based on camp population, not based on headcounts or actual usage. The Rule 30(b)(6) witnesses designated by the Army Sustainment Command (KBR's contractual counterparty) testified that staffing determinations were further impacted by factors such as the types of services available – *e.g.*, a facility with a gym has more staff than the same facility without a gym – as well as the hours the facility is open. And although KBR's precise motive behind tracking headcounts remains somewhat of a mystery, the Army witnesses also testified that such headcount data (false or not) had no bearing on costs billed to the Government, and that there was no indication the data affected award fee decisions.

Absent any connection between headcounts and cost determinations, it is difficult to imagine how the maintenance of false headcounts would be relevant, much less material, to the Government's decision to pay KBR.[9]  Nevertheless, McBride persists, claiming as "dispositive" an Administrative Contracting Officer's (ACO) statement in a declaration that he "might" have investigated further had he known false headcounts were being maintained, and that such an investigation "might" have resulted in some charged costs being disallowed.  The ACO's speculative statement could be true of the maintenance of *any* kind of false data; it tells us nothing special about headcounts.  At most, the statement amounts to the far-too-attenuated supposition that the Government *might* have had the "option to decline to pay."  *See Universal Health*, 136 S. Ct. at 2003 ("Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance.").  Given the speculative and generic nature of the ACO's statement, and the "rigorous" and "demanding" materiality standard that must be met, *id.* at 2002-03, McBride's evidence will not suffice to defeat summary judgment.

Moreover, we have the benefit of hindsight and should not ignore what actually occurred: the DCAA investigated McBride's allegations and did not disallow any charged costs.  In fact, KBR continued to receive an award fee for exceptional performance under Task Order 59 even after the Government learned of the allegations.  This is "very strong evidence" that the requirements allegedly violated by the maintenance of inflated headcounts are not material.  *See id.* at 2003 ("[I]f the

[9] Indeed, absent such a connection, it is doubtful that McBride can show a violation of a regulatory requirement occurred in the first place (*i.e.*, that headcounts were required to be maintained as supporting documentation for costs).

Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material.").

## V.

Finally, in a few sentences without citing any supportive authority, McBride asserts that the District Court "erred in requiring [her] to seek leave to file a fourth amended complaint" to cover additional camps and time periods. McBride Opening Br. at 28. In reality, the District Court appropriately determined McBride needed to amend her Complaint – and state her claims with particularity – before expanding her theory in the final stretch of discovery. The Court afforded McBride multiple opportunities to do so, and she declined. We have no occasion to review the regrets of her counsel.

## VI.

For the foregoing reasons, we affirm the grant of summary judgment by the District Court.

*So ordered.*