# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Submitted September 22, 2017   Decided November 17, 2017

No. 16-7096

DENNIS L. MONTGOMERY,
APPELLANT

v.

JAMES RISEN, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cv-00126)

———

*Larry Klayman* was on the briefs for appellant.

*Laura R. Handman* and *Lisa B. Zycherman* were on the brief for appellees.

*Bruce D. Brown* and *Gregg P. Leslie* were on the brief for *amici curiae* The Reporters Committee for Freedom of the Press and 35 Media Organizations in support of defendants-appellees.

Before: GRIFFITH and PILLARD, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*: Software developer Dennis Montgomery appeals from summary judgment in his defamation action. Montgomery claimed that author James Risen, together with publishers Houghton Mifflin Harcourt Publishing Company and Houghton Mifflin Harcourt Company (collectively, Defendants or Risen), made false and damaging statements about Montgomery in the book *Pay Any Price: Greed, Power, and Endless War* (2014). A chapter of the book focuses on software that Montgomery pitched to the United States as a counterterrorism tool, but that ultimately was widely seen as a "hoax." *Id*. at 33. Risen describes Montgomery and his phantom software as "the perfect case study to explain how during the war on terror greed and ambition have been married to unlimited rivers of cash to create a climate in which someone who has been accused of being a con artist was able to create a rogue intelligence operation with little or no adult supervision." *Id*. at 31-32.

This is Montgomery's defamation case—he chose to bring it. To sustain it against a motion for summary judgment, he would have had to marshal sufficient evidence to create a triable issue for a jury as to each element of his claim. The district court held that he failed to take the basic steps necessary to do so. Critically, he produced virtually no evidence of the software's functionality to factually rebut Risen's statements that it never worked as Montgomery said it did.

Risen's reporting is, at its core, about how authorities at the highest levels of government fell for a "ruse," *id.* at 32: software that could never be verified. This lawsuit, too, has been defined by the software's persistent absence. That lacuna in the record dooms Montgomery's case. We affirm the district court's well-reasoned grant of summary judgment in favor of Defendants.

## Background

### A.    The Challenged Chapter

Risen's book, *Pay Any Price*, argues that a post-9/11 scramble to strengthen national security led the U.S. government and its contractors to "throw cash at counterterrorism" and hastily create a "homeland security-industrial complex" that was both wasteful and ineffective. *Id.* at xiii-xvi, 32. Montgomery's software was the subject of one chapter titled "The Emperor of the War on Terror" (Chapter). *See id.* at 31-53.

The Chapter chronicles Montgomery's marketing of software he invented that, he claimed, had revolutionary capabilities to detect layers of data embedded in video and to perceive granular detail in video images taken at great distances. Montgomery first unsuccessfully pitched his software to Hollywood, the Chapter details, as a new way to more precisely colorize film from old black-and-white movies, and then to casinos in Las Vegas to scope out cheaters on surveillance tapes. Having struck out twice, he turned to Washington, D.C. Risen's Chapter focuses on how Montgomery sold his wares to the federal government. He persuaded Pentagon officials that the software could improve the accuracy of its predator drone program. And he convinced the Central Intelligence Agency (CIA) that it could detect hidden messages in television broadcasts.

The Chapter describes how the CIA came to believe that the software uncovered "hidden letters and numbers embedded" in Al Jazeera tapes—combinations like "AA" and "UA," followed by two or three digits. *Id.* at 41. According to Risen, the CIA connected the dots, concluding that those codes represented flights that would soon be the targets of impending

al Qaeda attacks. The software's influence culminated in December 2003: Then-CIA Director George Tenet "rushed directly to President [George W.] Bush when information provided by Montgomery and his software purported to show that a series of flights from France, Britain, and Mexico to the United States around Christmas were being targeted by al Qaeda." *Id.* at 42. Based on that data, the Chapter recounts, President Bush ordered that a series of flights be grounded. Information ostensibly mined from the broadcasts also caused the Bush administration to discuss directing fighter jets to shoot down a commercial flight filled with passengers over the Atlantic.

Once the "fever" of that post-9/11 period broke, Risen reports, government officials saw the software for what it was: an "illusion." *Id.* at 32.

### B. Procedural History

Incensed by the allegations in the Chapter, Montgomery sued Risen and his publisher in February, 2015. The Southern District of Florida, where Montgomery initially filed, transferred the case to the District of Columbia, where a substantial part of the relevant events and research into them occurred and for the convenience of the parties and witnesses. On July 15, 2016, the district court here issued an opinion resolving twelve outstanding motions or objections and granting Risen's motion for summary judgment. *See Montgomery v. Risen*, 197 F. Supp. 3d 219 (D.D.C. 2016).

The district court had directed Montgomery to produce the subject software. *Id.* at 238-45. It specifically rejected Montgomery's arguments that the software is either not relevant to the case or not capable of production. *Id.* at 239-42. The court was "substantially troubled by Montgomery's and his counsel's conduct in this case," specifically, their

representations about the software and failure to produce it in violation of a court order. *Id.* at 246. The court considered imposing case-ending spoliation sanctions, but deemed them unnecessary because the case was readily subject to judgment on its merits. *Id.*

It is worth remarking that this case is not the first in which Montgomery has balked at producing or otherwise demonstrating the capabilities of his obscure software. In his suit against his ex-employer in Nevada, he similarly refused in contravention of a court order to produce the software. J.A. 826-39. The court imposed monetary sanctions of $2,500 per day for continued failure to comply. J.A. 844. Montgomery settled that suit without producing his software. *See* J.A. 847-73.

The district court held that production of Montgomery's software or other evidence corroborating Montgomery's claims about its capabilities was critical to his case. Where a defamation plaintiff challenges statements on matters of public concern, it is his burden to prove the falsity of the statements. *See Montgomery*, 197 F. Supp. 3d at 239, 251-54. Risen was entitled to summary judgment because Montgomery failed to marshal evidence from which a reasonable jury could conclude that Risen's reporting about the software was untrue. *Id.* at 251-54.

The district court also held that Montgomery is a limited-purpose public figure, meaning that he could recover for defamation only if he further established that Risen published the falsehoods with "actual malice." *Id.* at 258. Montgomery failed to make any showing of actual malice on Risen or the publishers' part. *Id.* at 266. Because "a plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim," the court also granted Defendants

summary judgment on Montgomery's claims of intentional infliction of emotional distress, tortious interference with prospective advantage, and common law assault. *Id.* at 267 (quoting *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 319-20 (D.C. Cir. 1994)). This appeal followed.

### C.     Standard of Review

This court reviews *de novo* the district court's grant of summary judgment. *See Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 857 F.3d 939, 944 (D.C. Cir. 2017). We review evidentiary and discovery rulings for abuse of discretion. *See Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 584 (D.C. Cir. 2016). Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it may affect the outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if a reasonable jury could find for the non-moving party. *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). The movant bears the initial burden of demonstrating that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the non-movant must identify specific facts in the record to demonstrate the existence of a genuine issue. *Id.* at 324. A non-movant's own assertions about facts within her or his personal knowledge can be competent evidence to create a material factual dispute, *Johnson v. Perez*, 823 F.3d 701, 710 (D.C. Cir. 2016), but party assertions "so conclusory" as to put a jury in "no position to assess" whether they are based in fact will not suffice, *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

**Discussion**

As the district court correctly recognized, where a person claims to have been defamed by statements about matters of public concern, the First Amendment protects robust debate by preventing either "pure opinion[s]" or truthful statements from serving as grounds for liability. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990); *Phila. Newspapers Inc. v. Hepps*, 475 U.S. 767, 775-76 (1986). A plaintiff thus must make a showing of falsity as an element of his affirmative case. *Id.* The Supreme Court has acknowledged that "requiring the plaintiff to show falsity will insulate from liability some speech that is false, but unprovably so." *Hepps*, 475 U.S. at 777. If a subject of allegedly defamatory statements is a limited-purpose public figure, he must further demonstrate that those statements were made with actual malice. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974); *Clyburn v. News World Commc'ns, Inc.*, 903 F.2d 29, 31 (D.C. Cir. 1990).

It is undisputed that Risen's challenged statements involve matters of public concern. The Chapter in question recounts the peddling of dysfunctional software to the federal government and its use in high-level national security operations. Indeed, Montgomery was the subject of major national news coverage, even before Risen published the book, due to the national interest in the dozens of cancelled flights during the 2003 holiday season based on a terrorist threat ostensibly discovered by the software. *See, e.g.*, Lisa Myer et al., *Bogus Analysis Led to Terror Alert in Dec. 2003: CIA Experts Saw a Secret Code on Al-Jazeera That Wasn't There*, NBC News, June 27, 2005, *available at* www.nbcnews.com/id/8380365/ns/nbc_nightly_news_with_b rian_williams-nbc_news_investigates/t/bogus-analysis-led-terror-alert-dec/#.Wfc_9-SotQs.

Risen's allegedly defamatory statements fall into two categories. Some are "loose, figurative, or hyperbolic" commentary—such as Risen's characterization of Montgomery as a "maestro" and the software as an "elaborate and dangerous hoax[ ]," *see* Chapter at 32—which may not serve as a basis for liability. *See Milkovich*, 497 U.S. at 21; *see also Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724, 728 (1st Cir. 1992) (finding characterizations of plaintiff's production as "a rip-off, a fraud, a scandal, [and] a snake-oil job" to be merely "figurative and hyperbolic" and thus protected). Other statements include facts about Montgomery's software's nonexistence or dysfunction. To avoid summary judgment as to his challenges to Risen's factual statements, Montgomery would have had to show that the statements were false. *Hepps*, 475 U.S. at 777.

In opposing summary judgment, Montgomery provided virtually no evidence that any of Risen's factual statements were untrue. Faced with a court order directing Montgomery to provide the Federal Bureau of Investigations (FBI) with instructions on how to pinpoint the relevant software among the volumes of software in its possession, and requiring that he turn over the software to Risen within a ten-day period, Montgomery failed to comply. *See Montgomery*, 197 F. Supp. 3d at 237-39. And his own testimony—that the "software and technology did work, does work, and is still being used successfully by the U.S. Government," and that the "data detected by my software and technology did predict actual terrorist incidents," *see* J.A. 2007-08—is so conclusory that it would put a jury "in no position to assess" the truthfulness of his statements. *See Greene*, 164 F.3d at 675. Montgomery's argument that the software is irrelevant, *see* Appellant's Br. 9, is therefore unavailing under *Hepps*, and his refusal to proffer evidence about it is fatal.

Montgomery intimates that, if the court deems the software to be material, he should not be held to his burden because the software is classified and so he cannot produce it. *See* Appellant's Br. 48-49. As an initial matter, there is reason to doubt that the software is, in fact, classified. *See Montgomery*, 197 F. Supp. 3d at 243-44; *see also* J.A. 806 (excluding the software from a motion for a protective order filed by the United States in litigation in federal court in Nevada between Montgomery and his former employer). Even if the software is or was classified, Montgomery failed to take any steps to join issue on whether classification impermissibly obstructed his ability to satisfy his burden. Analysis of what record evidence suffices to avoid summary judgment is context-dependent, and we need not decide here what might have been enough. But it is clear that there were multiple avenues open to Montgomery to try to make the required showing, either directly or indirectly. He pursued none.

First, Montgomery could have facilitated production of the software, even if it is or was partially or completely classified. The FBI, for example, offered to "facilitate . . . reasonable access" to any material that Montgomery believed to be in its possession. *Montgomery v. Risen*, No. 16-cv-0126 (D.D.C.), Dkt. No. 126 at 3. The FBI explained that, given the masses of electronic information in its possession, it needed "specific instructions" from Montgomery about what he wanted. *Id.* at 4. Montgomery never provided those instructions. *Id.* Dkt. No. 158-1 ¶ 1; *id.* Dkt. No. 196-1 at 2; J.A. 1163. Montgomery also refused to turn over material that he, at some points, represented was in his possession or control, or to which he claimed to have a right of access. *Id.* Dkt. No. 107 ¶ 6. And he failed to take any steps to work with the court to accommodate its review of potentially classified or sensitive information. *See, e.g.*, *Hayden v. Nat'l Sec. Agency/Cent. Sec.*

*Serv.*, 608 F.2d 1381, 1384 (D.C. Cir. 1979) (discussing *in camera* review procedures for classified documents).

Second, it is possible that Montgomery might have used other forms of evidence, in lieu of the software itself, to put the functionality of the software in dispute. He might have, for example, provided his own detailed affidavit about the software's specifics. *See Johnson*, 823 F.3d at 709-10. Instead, as discussed above, his record testimony makes only bare and conclusory statements reaffirming the existence and functionality of the software. Montgomery also has made only vague references to witnesses who, he asserts, could corroborate his claims at trial, but he failed to put any such testimony into the record. *See* J.A. 2018. Because Montgomery failed to use any of the available means to show that his software was capable of functioning as he claimed it did, he has not carried his burden under *Hepps* to make a showing of falsity. We therefore affirm the district court's grant of summary judgment in Risen's favor.

We need not reach the additional questions whether Montgomery is a limited-purpose public figure or, if he is, whether Risen made the challenged statements with actual malice. *See Hepps*, 475 U.S. at 776. Summary judgment on the attendant tort claims is fully supported given the opinion or hyperbolic character of some statements and Montgomery's failure to put the remaining statements' falsity at issue. Finally, we review for abuse of discretion and sustain the district court's evidentiary and discovery holdings. With the able assistance of a magistrate judge, the district court appropriately determined that the software was unquestionably relevant and thus subject to production. It validly held that Risen did not forfeit his right to ask for it. The court soundly exercised its discretion to direct that Montgomery produce the software on specified terms. Montgomery's own failure to take steps to

provide it or otherwise to demonstrate that the software worked is what accounts for the failure of proof on the critical issue of the truth or falsity of the statements he challenges as defamatory. *See* Appellant's Br. 46-48.

## Conclusion

By choosing to sue for defamation, Montgomery asked the district court and now our court to pass upon the merits of his claims. But Montgomery has failed to put into the record any evidence that would permit a factfinder to evaluate the legitimacy of his bare assertions. We need not hypothesize about what evidence of the software's functionality might have been enough to defeat the motion for summary judgment, because Montgomery gives us virtually nothing to work with. We therefore affirm the district court's grant of summary judgment for Defendants James Risen, Houghton Mifflin Harcourt Publishing Company, and Houghton Mifflin Harcourt Company.

*So ordered.*