# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CANDACE OWENS, in her individual capacity, and CANDACE OWENS, LLC, a Delaware limited liability company,<br><br>Plaintiffs,<br><br>- against -<br><br>LEAD STORIES, LLC, a Colorado limited liability company, and GANNETT SATELLITE INFORMATION NETWORK, LLC d/b/a USA TODAY, a Delaware limited liability company,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. S20C-10–016 CAK |

Submitted: June 11, 2021
Decided: July 20, 2021

***Defendant Lead Stories, LLC's Motion to Dismiss for Lack of Personal Jurisdiction under Delaware Superior Court Civil Rule 12(b)(2)***

***Defendants' Motions to Dismiss for Failure to State a Claim under Delaware Superior Court Civil Rule 12(b)(6)***

## <u>MEMORANDUM OPINION AND ORDER</u>

Sean J. Bellew, Esquire, Bellew LLC, 2961 Centerville Road, Suite 302, Wilmington, DE 19808, Attorney for Plaintiffs.

Todd V. McMurtry, Esquire and Jeffrey A. Standen, Esquire, Hemmer DeFrank Wessels, PLLC, 250 Grandview Drive, Suite 500, Fort Mitchell, KY 41017, Attorneys for Plaintiffs (*Pro Hac Vice*).

John P. Coale, Esquire, 2901 Fessenden Street, NW Washington, DC 20008, Attorney for Plaintiffs (*Pro Hac Vice*).

Garvan McDaniel, Esquire, Hogan McDaniel, 1311 Delaware Avenue, Wilmington, DE 19806, Attorney for Defendant Lead Stories, LLC.

Craig Weiner, Esquire and Reena Jain, Esquire, Akerman LLP, 1251 Avenue of the Americas, 37th Floor, New York, NY 10020, Attorneys for Defendant Lead Stories, LLC (*Pro Hac Vice*).

Steven T. Margolin, Esquire, Lisa Zwally Brown, Esquire and Samuel L. Moultrie, Esquire; Greenberg Traurig, LLP, The Nemours Building, 1007 North Orange Street, Suite 1200, Wilmington, DE 19801, Attorneys for Defendant Gannett Satellite Information Network, LLC.

Michael J. Grygiel, Esquire and Cynthia Neidl, Esquire, Greenberg Traurig, LLP, 54 State Street, 6th Floor, Albany, NY 12207, Attorneys for Defendant Gannett Satellite Information Network, LLC (*Pro Hac Vice*).

Michael Pusateri, Esquire, Greenberg Traurig, LLP, 2101 L Street, NW, Suite 1000, Washington, DC 20037, Attorney for Defendant Gannett Satellite Information Network, LLC (*Pro Hac Vice*).

**KARSNITZ, J.**

## INTRODUCTION

Today's world of technological wizardry presents endless opportunities for conflict and battle like Kilkenny cats. Social influencers can sway opinions of millions of people controlling politics and money. Those with substantial control over social media like Facebook struggle to control fact from fiction. The case before me presents one battle in the social media wars. It also presents a real-life struggle affecting reputations, the ability to earn substantial income, and the ability to fact-check.

The political aspects of this case are manifest but must be ignored in favor of application of the law. The law and courts in general are often slow to react to changing times. By way of example, the jurisdictional principles I struggle with in this Opinion were not originally designed for the digital world but are evolving and adapting.

Elements of free speech also pervade this case. While many have argued that those private actors who control aspects of the internet should have their control limited, as the law currently exists, private actors are not constrained by First Amendment constitutional principles. I leave to further debate the question of whether these private actors should be otherwise restricted in their control of content.

One final preliminary note. I have no doubt the parties to this suit have divergent views on many things. I also have no doubt they have acted in good faith

in their efforts to promote their views as shown by their conduct which forms the factual basis for this lawsuit.

## PERSONAL JURISDICTION OVER LEAD STORIES, LLC

Today I am asked to determine the constitutionally permissible reach of the Delaware long-arm statute[1] through cyberspace. This case stands at the intersection of the traditional law of personal jurisdiction, particularly with respect to interstate commerce in tangible goods and services, and the modern use of websites on the Internet to publish, disseminate and sell information. As this Court has stated:

> The pending motions [to dismiss] require this Court to probe questions of personal jurisdiction at perhaps their most theoretical. Courts across the country increasingly are confronted with cases challenging online conduct and must determine issues of personal jurisdiction over actors engaged in such conduct. These cases highlight the reality that the Internet, which increasingly forms an important part of our day-to-day interactions, exists outside of the state boundaries that define considerations of jurisdiction.[2]

However, in my view, the fact that the product allegedly causing the tortious injury in this case is modern – digital information disseminated through the Internet – does not necessarily require a departure from the more traditional jurisprudence of personal jurisdiction, or a unique or even different jurisdictional analysis. I am not deciding this case using, as the determinative factor, the fact that the product

---

[1] 10 *Del. C.* § 3104(c).

[2] *Rotblut v. Terrapinn, Inc.*, 2016 WL 5539884, at *1 (Del. Super. Sept. 30, 2016).

allegedly causing tortious injury is electronic media, as opposed to any other form of media or a tangible physical object. An entity's reaching beyond its state's borders, allegedly causing tortious injury in Delaware by an act committed in Delaware, should not be treated differently for personal jurisdiction purposes merely because the act is committed over the Internet.

## BACKGROUND

Defendant Lead Stories, LLC, a Colorado limited liability company ("Lead Stories") has a contract with Facebook, Inc., a Delaware corporation ("Facebook") to regularly transmit fact-checking stories over the Internet to Facebook. Facebook may in turn use those stories to place covers over its users' Facebook webpages, warning about the veracity of the users' posts on those webpages. Some of these stories have been about Candace Owens, in her individual capacity, and Candace Owens, LLC, a Delaware limited liability company (collectively, "Plaintiffs"), and warning covers have been placed over their Facebook webpages. Such warning covers appear on Facebook webpages worldwide, including those seen in Delaware. Plaintiffs assert a variety of tort claims, addressed later in this Opinion, against Lead Stories for injury allegedly arising out of these facts.

On October 18, 2020, Plaintiffs filed a Complaint against, *inter alia*, Defendant Lead Stories. On December 18, 2020, Lead Stories filed a Motion to Dismiss the Complaint as against Lead Stories under Delaware Superior Court Civil

Rule 12(b)(2) for lack of personal jurisdiction over Lead Stories. On February 24, 2021, I heard oral argument on this Motion. This is my decision on that Motion.

**SUMMARY**

Plaintiffs, on the one hand, tell me that the foregoing facts are sufficient in and of themselves to give me jurisdiction over Lead Stories. Lead Stories, on the other hand, essentially argues that Plaintiffs' argument cannot withstand the constitutional rigors of personal jurisdiction analysis. Lead Stories tells me that it has no presence in Delaware for purposes of general (or "all purpose") jurisdiction, and that strict "but for" causation by Lead Stories of Plaintiffs' alleged injury within Delaware is required to confer specific (or "case limited") jurisdiction. In my view, there is a more nuanced, middle ground between these two approaches. In that middle ground, questions of personal jurisdiction are best resolved by a common sense, fact-driven analysis.

Although the development of the law, including Delaware law, regarding the permissible reach of personal jurisdiction based on the use of the Internet is in its infancy, the standard I adopt is well articulated as follows:

> [T]he likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet.[3]

---

[3] This standard was articulated by the Court in *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997) (citations omitted); see discussion, *post*.

Using this standard, I have examined the level of interactivity and the commercial nature of the exchange of information that occurred on the Facebook website, using the Lead Stories information, to determine the exercise of personal jurisdiction. I have determined that the nature and quality of this commercial activity warrants that I can constitutionally exercise personal jurisdiction over Lead Stories.

In addition to this standard, the lodestar for me in the exercise of personal jurisdiction is whether two values are upheld: treating Lead Stories fairly, and protecting "interstate federalism;" i.e., preventing a State with little legitimate interest in a case from encroaching on a State more affected by the controversy.[4] In my view, Lead Stories had, or should have had, fair warning that its fact-checking stories, as used by Facebook, might subject it to jurisdiction in Delaware.[5] Moreover, in my view, Delaware has a greater interest than Colorado in the outcome of this case.[6] A denial of jurisdiction would lead to an unfair and inefficient result, because it would require Plaintiffs to pursue multiple causes of actions in different jurisdictions, with the possibility of inconsistent results and the certainty of increased costs.

Finally, Delaware courts have consistently held that our long-arm statute is to

---

[4] *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297-298 (1980).
[5] See *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985).
[6] See *Bristol-Myers Squibb Co.* v. *Superior Court of Cal., San Francisco Cty.*, 137 S. Ct. 1773 (2017).

be construed broadly to confer personal jurisdiction to the maximum extent possible under the due process clause.[7]

## ANALYSIS

### Standard of Review

Pursuant to Delaware Superior Court Civil Rule 12(b)(2), Plaintiffs bear the burden of establishing that I have personal jurisdiction over Lead Stories.[8] Personal jurisdiction over a nonresident defendant is proper where: (1) Delaware's long-arm statute applies; and (2) the Court's exercise of jurisdiction does not violate constitutional due process.[9] Plaintiffs must make a specific showing that Delaware maintains jurisdiction under its long-arm statute.[10]

Pursuant to Delaware's long-arm statute, I may exercise general or specific personal jurisdiction over a non-resident defendant when the party maintains the requisite minimum contacts with Delaware enumerated in the statute.[11] General jurisdiction requires a plaintiff to show that the "defendant regularly and continuously conducted business within Delaware."[12] For specific jurisdiction,

---

[7] *Daily Underwriters of America v. Maryland Auto. Ins. Fund*, 2008 WL 3485807, at *3 (Del. Super. July 31, 2008); *Hercules Inc. v. Leu Trust & Banking Ltd.*, 611 A.2d 476, 480 (Del. 1992) (citing *LaNuova D & B, S.p.A. v. Bowe Co., Inc.*, 513 A.2d 764, 768 (Del. 1986) ("[S]ection 3104(c) has been broadly construed to confer jurisdiction to the maximum extent possible under the due process clause.")).

[8] *Schweitzer v. LCR Capital Partners, LLC*, 2020 WL 1131716, at *5 (Del. Super. Mar. 9, 2020).

[9] *LaNuova D & B, S.p.A. v. Bowe Co., Inc.*, 513 A.2d 764, 768 (Del. 1986).

[10] *Greenly v. Davis*, 486 A.2d 669, 670 (Del. 1984).

[11] *Clayton v. Farb*, 1998 WL 283468, at *1 (Del. Super. Apr. 23, 1998).

[12] *Tell v. Roman Catholic Bishops of Diocese*, 2010 WL 1691199, at *8 (Del. Super. Apr. 26, 2010).

plaintiff is required to make "a showing that the cause of action arises from conduct occurring within the state."[13]

If there is a statutory basis to exercise jurisdiction, this Court must then consider whether such an exercise is consistent with the requirements of due process.[14] To satisfy due process, Plaintiffs must show "minimum contacts" exist between Lead Stories and Delaware such that the exercise of jurisdiction is consistent with "traditional notions of fair play and substantial justice."[15] These "minimum contacts" must be rooted in an "act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."[16] Thus, a defendant must purposefully establish minimum contacts with the forum state such that the defendant could reasonably "anticipate being haled into court" there.[17]

## GENERAL PERSONAL JURISDICTION

General (or all purpose) jurisdiction is based on a nonresident defendant's persistent, continuous, and substantial course of conduct through which the

---

[13] *Id.*; *Rotblut*, 2016 WL 5539884, at *5.

[14] *Rotblut*, 2016 WL 5539884, at *4.

[15] *World-Wide Volkswagen Corp.*, 444 U.S. at 292 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)); *Ciabattoni v. Teamsters Local 326*, 2016 WL 4442277, at *4 (Del. Super. Aug. 22, 2016).

[16] *Asahi Metal Indus. Co., Ltd. v. Super. Ct. of California, Solano Cty.*, 480 U.S. 102, 109 (1987) (quoting *Burger King Corp.*, 471 U.S. at 475).

[17] *Burger King Corp.*, 471 U.S. at 474.

nonresident creates a general presence in Delaware.[18]  To subject Lead Stories to general jurisdiction pursuant to 10 *Del. C.* §3104(c)(4), Plaintiffs must allege at least one of three things: (1) Lead Stories regularly conducts or solicits business in Delaware; (2) Lead Stories engages in any other persistent course of conduct in Delaware; or (3) Lead Stories derives substantial revenues from its services used in Delaware.[19]  It is Plaintiffs' burden to show Lead Stories' conduct falls within the reach of 10 *Del. C.* §3104(c)(4).[20]

### Regularly Conduct or Solicit Business in Delaware

Plaintiffs argue that "Lead Stories regularly contracts to supply fact-checking services to Facebook, which operates extensively in [Delaware]."[21]  However, that allegation goes to the contacts of Facebook with Delaware, not the contacts of Lead Stories with Delaware.  Lead Stories' employees, office and other contacts are all in Colorado.  This Court has held that mere maintenance of a website or webpage over the Internet accessible to anyone, including Delawareans, whether by Facebook or Lead Stories, is insufficient to confer general jurisdiction.[22]  Thus, Lead Stories is not subject to general jurisdiction under this prong of 10 *Del. C.* §3104(c)(4).

### Engage in Any Other Persistent Course of Conduct in Delaware

---

[18] *Herman v. BRP, Inc.*, 2015 WL 1733805, at *4 (Del. Super. Apr. 13, 2015).
[19] *See* 10 *Del. C.* § 3104(c)(4); *LaNuova D&B, S.p.A.*, 513 A.2d at 767–68.
[20] *Schweitzer*, 2020 WL 1131716, at *5.
[21] Compl. ¶ 44; Plaintiffs' First Amended Complaint (Transaction ID 6657138) ¶ 46 [hereinafter Pls. Am. Compl.].
[22] *Rotblut*, 2016 WL 5539884, at *6.

10

Plaintiffs argue that because "Lead Stories regularly contracts to supply fact-checking services to Facebook which operates extensively in [Delaware]" that "Lead Stories regularly engages in a persistent course of conduct in Delaware."[23] This argument fails for two reasons. First, the conduct alleged is that of Facebook, not Lead Stories. Plaintiffs suggest that because Lead Stories contracts with Facebook to supply fact-checking services to Facebook, Lead Stories itself therefore engages in a persistent course of conduct in Delaware. But, as discussed above, mere maintenance of a website or webpage over the Internet accessible to anyone, including Delawareans, whether by Facebook or Lead Stories, is insufficient to confer general jurisdiction.[24] Second, setting aside Lead Stories' contractual relationship with Facebook, Plaintiffs fail to identify any other persistent course of conduct by Lead Stories in Delaware.

Moreover, Lead Stories is not registered, licensed, or otherwise authorized to do business in Delaware.[25] Nor does Lead Stories maintain an office, interests, real property, or assets in Delaware.[26] Lead Stories has never paid any taxes to the State of Delaware, and it does not maintain any ongoing material contractual relationships with entities or individuals in Delaware.[27]

---

[23] Compl. ¶ 44; Pls. Am. Compl. ¶ 46.

[24] *Rotblut*, 2016 WL 5539884, at *6.

[25] Duke Decl. ¶ 10.

[26] *Id*. at ¶¶ 11–12. Plaintiffs make no allegations to support jurisdiction under §§ 3104 (c)(5) or (c)(6).

[27] *Id*. at ¶ 12.

Thus, Lead Stories is not subject to general jurisdiction under this prong of 10 *Del. C.* §3104(c)(4).

**Derive Substantial Revenue for Its Services Used in Delaware**

Plaintiffs allege that Lead Stories "derives substantial revenue from Delaware by providing fact-checking services to Delaware through its website and through Facebook."[28] This Court has rejected the argument that an "employee's receipt of a salary based on services rendered to a company that allegedly derives substantial revenue from its activities in Delaware is a sufficient contact under §3104(c)(4) to confer personal jurisdiction over [the employee]."[29] Moreover, receipt of a salary, "part of which might reflect time spent working to generate fees related to services an employer provided in Delaware, would [not] satisfy the Due Process Clause's minimum contacts requirement." [30]  Even if Lead Stories receives substantial revenue from its agreement with Facebook, Plaintiffs fail to allege that Lead Stories derived substantial revenue from activities in Delaware.

Thus, Lead Stories is not subject to general jurisdiction under this prong of 10 *Del. C.* §3104(c)(4).

To summarize the elements of general personal jurisdiction: Plaintiffs do not

---

[28] Compl. ¶ 44; Pls. Am. Compl. ¶ 46.
[29] *Rotblut*, 2016 WL 5539884, at *7.
[30] *Hartsel v. Vanguard Grp., Inc.*, 2011 WL 2421003, at *7 (Del. Ch. June 15, 2011), *aff'd*, 38 A.3d 1254 (Del. 2012).

sufficiently allege that Lead Stories (1) regularly conducts or solicits business in Delaware, (2) engages in any other persistent course of conduct in Delaware, or (3) derives substantial revenue from services or things used or consumed in Delaware.[31] Accordingly, Plaintiffs are unable to persuade me that I may properly exercise general personal jurisdiction over Lead Stories.[32]

## SPECIFIC PERSONAL JURISDICTION

To subject Lead Stories to specific (or case-limited) personal jurisdiction under the Delaware long-arm statute, Plaintiffs must allege that Lead Stories (1) transacts business or performs work or services in Delaware[33]; (2) contracts to provide "services or things" in Delaware[34]; or (3) causes tortious injury in Delaware by an act or omission in Delaware.[35] Although Plaintiffs and Lead Stories present arguments for and against the proposition that Lead Stories transacts business or performs work or services in Delaware, and contracts to provide "services or things" in Delaware, under 10 *Del. C.* §3104(c)(1) and 10 *Del. C.* §3104(c)(2), respectively, I need not address those arguments. The Delaware long-arm statute is in the disjunctive, so any one of the three bases for specific personal jurisdiction will

---

[31] Duke Decl. ¶ 11.

[32] See *Aeroglobal Capital Management, LLC v. Cirrus Industries, Inc.*, 871 A. 2d 428, 438 (Del. 2005).

[33] 10 *Del. C.* §3104(c)(1).

[34] 10 *Del. C.* §3104(c)(2).

[35] 10 *Del. C.* §3104(c)(3); *Tell*, 2010 WL 1691199, at *8 (noting that the cause of action must arise from conduct within Delaware).

suffice for jurisdiction to attach. I also decide cases on the narrowest possible grounds. I find that Plaintiffs sufficiently allege that Lead Stories caused tortious injury in Delaware by acts or omissions in Delaware under 10 *Del. C.* §3104(c)(3), which in and of itself provides a sufficient basis for personal jurisdiction.

## Personal Jurisdiction Under 10 *Del. C.* §3104(c)(3)

10 *Del. C.* §3104(c)(3) requires Plaintiffs to allege that Lead Stories caused a tortious injury in Delaware resulting from an act or omission by Lead Stories in Delaware.[36] A naked allegation that a tortious injury occurred in Delaware, without more, does not satisfy 10 *Del. C.* §3104(c)(3).[37] Delaware law further requires Plaintiffs to allege that the injury was caused by an act or omission which was committed in Delaware.[38] "The dual reference to 'within the state' indicates that the draftsmen intended that there be two separate events, each within the State."[39] "[P]laintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him."[40]

When considering whether a defendant acted within Delaware, this Court has required "something more" than "the knowledge that [a] website could be viewed or

---

[36] *See Hartsel*, 2011 WL 2421003, at *14.
[37] *Rotblut*, 2016 WL 5539884, at *6.
[38] *Id.*; *Tell*, 2010 WL 1691199, at *14 (declining to exercise personal jurisdiction under § 3104(c)(3) where plaintiff alleged no act or omission of the defendants occurred in Delaware).
[39] *Ramada Inns, Inc. v. Drinkhall*, 1984 WL 247023, at *2 (Del. Super. May 17, 1984).
[40] *Milliken v. Meyer*, 311 U.S. 457, 463 (1940).

that their product could be used in [Delaware]."[41]  In *Rotblut*, an individual author who resided in Illinois, and subsequently Washington, D.C., wrote a blog which a Delaware subsidiary corporation posted on a website owned and hosted by its parent holding company, which was incorporated under the laws of the United Kingdom with a principal place of business in London, England.  Plaintiffs sued the author, the subsidiary, and the holding company for defamation.  The Court recognized that it had jurisdiction over the Delaware subsidiary, but held that it had no specific personal jurisdiction over the author or the parent holding company under 10 *Del. C.* §3104(c)(3) and granted their motions to dismiss.  Assuming *arguendo* that there was a tortious injury in Delaware, the Court found that the mere fact that the parent holding company owned the website, on which it hosted postings by its subsidiary, was not enough under 10 *Del. C.* §3104(c)(3), and thus considered whether the parent holding company "committed an act or omission" in Delaware.  The Court found that the parent holding company's awareness that its website might be viewed in Delaware or viewed by Delaware residents is not "an act or omission" in Delaware under 10 *Del. C.* §3104(c)(3).  Similarly, the Court held that, since the individual author had not been in Delaware, or had any other presence in or contact with Delaware when the story was written, he had not committed "an act or omission" in Delaware under 10 *Del. C.* §3104(c)(3).

---

[41] *Rotblut*, 2016 WL 5539884, at *5.

This case is distinguishable from *Rotblut*. Lead Stories contracted with Facebook, a Delaware corporation, to provide fact-checking services and stories to Facebook. Using those services and stories, Facebook placed warnings on the Facebook page of Plaintiffs, one of whom is a Delaware limited liability company, including the page as it appeared to Delaware customers and which, as alleged in the Complaint, drove Plaintiffs' customers away from their Facebook page, negatively affected the business they generated from their Facebook page, and diverted their customers away from their Facebook page to the website of Lead Stories – a competitor – and its advertisers. The contract with which Lead Stories allegedly tortiously interfered is between a Delaware corporation (Facebook) and a Delaware limited liability company (Candace Owens, LLC). Plaintiffs allege that, because of Lead Stories' information, Facebook determined that Plaintiffs were in breach of their contractual obligations to Facebook, thus triggering Facebook's adverse actions against Plaintiffs, including restricting their ability to advertise, suspending their account, and demonetizing their relationship.

Lead Stories, although its fact-checking stories about Plaintiffs may have been written in Colorado, had a contract with Facebook, in the regular course of business, to use those stories as warnings to cover Plaintiffs' Facebook account. Lead Stories knew or should have known that its stories could be used, among other places, on the Facebook page of a Delaware LLC as it appeared in Delaware.

16

The federal courts in the Third Circuit have taken an expansive view of the Delaware and Pennsylvania long-arm statutes, in the context of the Internet, that favors specific personal jurisdiction. In *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*,[42] the manufacturer of "Zippo" tobacco lighters brought federal and state law claims against a computer news website which used domain names using the word "zippo." The Court held that, by zippo offering its website news service to Pennsylvanians, (1) zippo purposefully availed itself of doing business in Pennsylvania and was subject to personal jurisdiction there, (2) Zippo's claims arose out of zippo's Pennsylvania-related conduct, and (3) the exercise of personal jurisdiction over zippo in Pennsylvania was reasonable. The Court stated:

> [T]he likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet. This sliding scale is consistent with well developed personal jurisdiction principles. At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise [sic] personal jurisdiction. The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that

---

[42] 952 F. Supp. 1119 (W.D. Pa. 1997).

17

occurs on the Web site.[43]

This case is not at either extreme, but in the middle.  Lead Stories did not enter into discrete contracts with Delawareans for its fact-checking services and stories. Nor did it simply post its fact-checking services and stories on a passive website that was available only to those who were interested in them.  Rather, Lead Stories' fact-checking services and stories were posted on Facebook, an interactive website where users could take any number of actions adverse to Plaintiffs, including leaving Plaintiffs' Facebook page, switching to the website of Lead Stories – a competitor – and its advertisers, and not spending money on Plaintiffs' website.  In addition, Facebook itself could take actions adverse to Plaintiffs, including restricting their ability to advertise, suspending their account, and demonetizing their relationship. In such a case, when I examine the "level of interactivity and commercial nature of the exchange of information that occurs on the website," I am persuaded that the exercise of specific personal jurisdiction is appropriate.

In *Kloth v. Southern Christian University*,[44] a Delaware student sued a private Alabama university's "distance learning" program (i.e., on-line school) for breach of an implied contract to provide her with a complete education and discrimination against her because she was not a Christian.  Only two Delaware students (including

---

[43] *Id.*, at 1124 (citations omitted).
[44] 494 F. Supp. 2d 273 (D. Del. 2007), *aff'd*, 320 F. App'x 113 (3d Cir. 2008).

plaintiff) used the program. The Court found no basis for general personal jurisdiction over the university under 10 *Del. C.* §3104(c)(4) but stated that specific personal jurisdiction would be proper when "a defendant's website is specifically designed to commercially interact with the residents of [Delaware]."[45] Finding that the university's passive website was not so designed, the Court declined to exercise personal jurisdiction and granted the defendant's motion to dismiss. However, in this case, Lead Stories' website, as used by Facebook, was very much designed to interact with Delaware residents, among others, although their number cannot be precisely ascertained.

## CONSTITUTIONAL DUE PROCESS

The Fourteenth Amendment's Due Process Clause limits my power to exercise jurisdiction over Lead Stories. The seminal decision in this area remains *International Shoe Co. v. Washington*.[46] There, the United States Supreme Court held that a tribunal's authority depends on the defendant's having such "contacts" with the forum State that "the maintenance of the suit" is "reasonable" and "does not offend traditional notions of fair play and substantial justice."[47] In applying that formulation, the United States Supreme Court has long focused on the nature and

---

[45] Id., at 279.
[46] 326 U.S. 310, 316 (1945).
[47] *Id.,* at 316–317.

extent of "the defendant's relationship to the forum State."[48] That focus led to the recognition of the two types of personal jurisdiction: general and specific jurisdiction. A state court may exercise general jurisdiction only when a defendant is "essentially at home" in the State.[49] Specific jurisdiction covers defendants less intimately connected with a State, but only as to a narrower class of claims. To be subject to that kind of jurisdiction, the defendant must take "some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State."[50] And the plaintiff's claims "must arise out of or relate to the defendant's contacts" with the forum state.[51]

Enter *Ford Motor Company v. Montana Eighth Judicial District Court*[52] ("Ford Motor"). In that case, Ford, a nonresident of the forum state, had manufactured and sold automobiles in states other than the forum states, but the current owners of the automobiles sued Ford for death and injuries sustained when the automobiles malfunctioned in the forum states. Ford heavily advertised, and conducted sales and service of, other automobiles in the forum states. Ford appealed dismissal of its motion to dismiss for lack of personal jurisdiction in the lower state courts. The Supreme Court affirmed the lower courts and upheld specific personal

---

[48] *Bristol-Myers Squibb Co.* v. *Superior Court of Cal., San Francisco Cty.*, 137 S.Ct. 1773, 1779 (2017).

[49] *Goodyear Dunlop Tires Operations, S. A v. Brown*, 564 U.S 915, 919 (2011).

[50] *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

[51] *Bristol-Myers*, 137 S.Ct., at 1786.

[52] 141 S. Ct. 1017 (2021).

jurisdiction.

Ford did not contest that it does business in the forum states and that it actively seeks to serve the market for automobiles and related products in those states. Or to put that concession in more doctrinal terms, Ford agreed that it "purposefully avail[ed] itself of the privilege of conducting activities" in those states.[53] Ford claimed instead that those activities did not sufficiently connect to the suits, even though the resident plaintiffs alleged that Ford automobiles malfunctioned in the forum states. In Ford's view, the needed link must be causal in nature: jurisdiction attaches "only if the defendant's forum conduct *gave rise to* the plaintiff 's claims."

Writing for a majority of five, Justice Kagan, who in 2017 wrote a vigorous dissent in *Bristol-Meyers Squibb Co.* accusing the majority in that case of unduly curbing the exercise of specific jurisdiction, expanded the scope of specific jurisdiction.   She concluded that the *Bristol-Meyers Squibb Co.* test that the plaintiff's claims must "arise out of *or* relate to the defendant's contacts" with the forum state (emphasis supplied), since it is disjunctive, creates two individual bases for specific personal jurisdiction – a claim which "arises out of" or a claim which "relates to" – defendant's contacts with the forum state, and either will suffice to exercise specific personal jurisdiction.  The Court found that the plaintiffs' claims both arose out of, and related to, Ford's extensive contacts with the forum states, and

---

[53] *Hanson*, 357 U.S. 235, 253 (1958).

upheld the lower courts' exercise of specific personal jurisdiction, notwithstanding the fact that the automobiles had been neither manufactured nor sold in the forum states.

Justice Alito, concurring in the result, decried the majority's creation of two tests, and asserts that there is only one: the classic "minimum contacts' test of *International Shoe*.

Justices Gorsuch and Thomas, also concurring in the result, went one step further, and called for a return to the law of personal jurisdiction as it existed *before International Shoe*.

*Ford Motor*, unlike this case, does not involve defendants' contacts on the Internet. However, I am an aficionado of duck decoys, so I note with particular interest the discussion by Justice Gorsuch of a hypothetical that was asked at oral argument[54] and mentioned by the majority in a footnote:

> The majority imagines a retiree in Maine who starts a one-man business, carving and selling wooden duck decoys. In time, the man sells a defective decoy over the Internet to a purchaser in another State who is injured. We aren't told how. (Was the decoy coated in lead paint?) But put that aside. The majority says this hypothetical supplies a useful study in contrast with our cases. On the majority's telling, Ford's "continuous" contacts with Montana and Minnesota are enough to establish an "affiliation" with those States; by comparison, the decoy seller's contacts may be too "isolated" and "sporadic" to entitle an injured buyer to sue in his home State. But if this comparison highlights anything, it is only the litigation sure to follow. For between the poles of "continuous" and "isolated" contacts lie a virtually infinite number

---

[54] Tr. of Oral Arg. 39.

22

of "affiliations" waiting to be explored. And when it comes to that vast terrain, the majority supplies no meaningful guidance about what kind or how much of an "affiliation" will suffice. Nor, once more, does the majority tell us whether its new affiliation test supplants or merely supplements the old causation inquiry.

But, today, even an individual retiree carving wooden decoys in Maine can "purposefully avail" himself of the chance to do business across the continent after drawing online orders to his e-Bay "store" thanks to Internet advertising with global reach. A test once aimed at keeping corporations honest about their out-of-state operations now seemingly risks hauling individuals to jurisdictions where they have never set foot.

Perhaps this is the real reason why the majority introduces us to the hypothetical decoy salesman. Yes, he arguably availed himself of a new market. Yes, the plaintiff 's injuries arguably arose from (or were caused by) the product he sold there. Yes, *International Shoe*'s old causation test would seemingly allow for personal jurisdiction. But maybe the majority resists that conclusion because the old test no longer seems as reliable a proxy for determining corporate presence as it once did. Maybe *that's* the intuition lying behind the majority's introduction of its new "affiliation" rule and its comparison of the Maine retiree's "sporadic" and "isolated" sales in the plaintiff 's State and Ford's deep "relationships" and "connections" with Montana and Minnesota.

Putting Justice Gorsuch's jurisprudential concerns aside, in this case Plaintiffs" claims clearly "relate to" Lead Stories' contacts with Delaware via Facebook on Plaintiffs' webpage. These contacts were neither isolated nor sporadic, but continuous. In my view, *Ford Motor* mitigates in favor of specific personal jurisdiction over Lead Stories. The requirements of the Due Process Clause of the Fourteenth Amendment to the United States Constitution are satisfied.

23

## CONCLUSION

Plaintiffs have not provided me with a sufficient basis on which I may exercise general personal jurisdiction over Lead Stories under Delaware law. Plaintiffs have, however, provided me with a sufficient basis on which I may exercise specific personal jurisdiction over Lead Stories under Delaware law. The nature and quality of the commercial activity that Lead Stories conducted over the Internet mitigate in favor of specific personal jurisdiction. Although Lead Stories did not directly transact business or perform work or services in Delaware, or contract to provide "services or things" in Delaware, it contracted with Facebook to supply fact-checking services and stories which were disseminated by Facebook in Delaware in such a manner as to allegedly cause tortious injury in Delaware, which could reasonably have been foreseen by Lead Stories. Moreover, I find that the exercise of specific personal jurisdiction over Lead Stories comports with constitutional due process requirements under *Ford Motor Company*. Accordingly, I exercise specific personal jurisdiction over Lead Stories.

For the reasons stated above, I **DENY** Defendant Lead Stories' Motion to Dismiss for Lack of Personal Jurisdiction under Delaware Civil Rule 12(b)(2).

**IT IS SO ORDERED.**

I turn now to both Defendants' Motions to Dismiss for failure to plead cognizable claims.

24

## FAILURE TO STATE A CLAIM

A bedrock principle of our law is that the United States Constitution protects freedom of speech.[55] As Justice Brett Kavanaugh noted, while sitting as a D.C. Circuit Court judge, the United States Supreme Court has guided courts to "expeditiously weed out unmeritorious defamation suits" because they can threaten freedom of speech.[56] Early dismissal of defamation lawsuits for failure of the complaint to state a claim on which relief can be granted "not only protects against the costs of meritless litigation, but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive."[57] The same logic should apply to other tort lawsuits whose complaints are based on defendants' injurious false statements, where First Amendment limitations apply.[58]

## BACKGROUND

As discussed earlier in this Opinion, this suit arises out of Facebook's third-party partners' fact-checking articles regarding Plaintiffs' Facebook posts.[59]

---

[55] U.S. Const. amend. I.

[56] *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).

[57] *Fairbanks v. Roller*, 314 F. Supp. 3d 85, 89 (D.D.C. 2018) (citation omitted).

[58] *Blatty v. New York Times Co.*, 728 P.2d 1177, 1184 (Cal. 1986) (en banc) (explaining why the First Amendment should apply to any claim whose gravamen is an injurious falsehood statement).

[59] Pls. Am. Comp. ¶¶ 1–2.

Defendant Lead Stories and Defendant Gannett Satellite Information Network, LLC, a Delaware limited liability company d/b/a USA TODAY ("Gannett" or "USA TODAY") (Gannett and USA TODAY, collectively, "Defendants") have contractual relationships with Facebook, which pays its third-party fact-checking partners, including Defendants, to publish "fact-check" articles examining whether certain Facebook posts contain untruthful information.[60]

On October 18, 2020, Plaintiffs filed a Complaint against both Defendants. On May 4, 2021, Plaintiffs filed a Motion for Leave to File and Serve the First Amended Complaint (the "Amended Complaint"), and, on June 21, 2021 I granted Plaintiffs' Motion. In the Amended Complaint, Plaintiffs assert three tort claims against both Defendants: (1) intentional interference with contractual relations, (2) tortious interference with prospective business relations, and (3) unfair competition at common law.[61] Plaintiffs assert two additional tort claims solely against Defendant Lead Stories: (4) defamation with actual malice, and (5) defamation with common law malice.[62]

On December 18, 2020, both Defendants filed a Motion to Dismiss the Complaint under Delaware Superior Court Civil Rule 12(b)(6) for failure to state a

---

[60] *Id.* ¶¶ 33, 34, 40, 41.
[61] Pls. Am. Compl., ¶¶ 141–64.
[62] Pls. Am. Compl., ¶¶ 165–89.

claim. On April 28, 2021, I heard oral argument on these Motions. This is my decision on those Motions.

Plaintiff Candace Owens is a conservative political commentator and an active user of Facebook and other social media, including Twitter.[63] She is a public figure.[64] Plaintiff Candace Owens, LLC is a Delaware limited liability company primarily controlled by Candace Owens to, among other things, maintain Candace Owens' Facebook page.[65] Candace Owens writes the content that she posts on her social media pages operated by Candace Owens, LLC.[66]

On March 29, 2020, Candace Owens published a post on her Facebook page claiming that the methods U.S. governmental officials used for counting COVID-19 deaths overstated the peril and the scope of the COVID-19 pandemic (the "First Facebook Post").[67] To support her claim, she linked and referenced Dr. John Lee's article in the First Facebook Post.[68] Dr. Lee is a consultant pathologist with the United Kingdom's National Health Service and wrote an article showing his concern related to the U.K. methods of counting the COVID-19 death toll.[69]

---

[63] *Id.* ¶¶ 5–13.
[64] *See id.* ¶¶ 6, 13 (describing Candace Owens as a "popular" commentator and "a prominent social media star").
[65] *Id.* ¶¶ 21–22.
[66] *Id.* ¶ 25.
[67] *Id.* ¶ 55.
[68] *Id.* ¶ 57.
[69] *Id.* ¶ 58.

On April 1, 2020, Lead Stories published an article fact-checking Owens' First Facebook Post (the "Lead Stories Article").[70] The Lead Stories Article determined that Owens' First Facebook Post was false and labeled Owens' First Facebook Post with the terms "Hoax Alert" and "False."[71] Lead Stories publication of its article caused Facebook to place a false information warning label on the First Facebook Post.[72]

On April 28, 2020, Candace Owens published a post on her Facebook page questioning the relationship between the counting of COVID-19 deaths and flu deaths in early 2020 (the "Second Facebook Post").[73] In the Second Facebook Post, she cited CDC reports and argued in a sarcastic manner that the number of flu deaths had decreased drastically in early 2020.[74]

On April 30, 2020, USA TODAY published a fact-check article analyzing data from the CDC and concluding that Owens' Second Facebook Post carried false information (the "USA TODAY Article").[75] As a result of that article, Facebook displayed a false information warning label on the Second Facebook Post.

---

[70] *Id.* ¶ 72.
[71] *Id.* ¶ 77.
[72] *Id.* ¶ 83.
[73] *Id.* ¶ 63.
[74] *Id.* ¶¶ 63–64.
[75] *Id.* ¶ 79, Ex. E.

Plaintiffs attached as exhibits to their Amended Complaint the First Facebook Post, the Second Facebook Post, Dr. Lee's article, the Lead Stories Article, and the USA TODAY Article.[76]

During relevant times, Plaintiffs and Facebook had an advertising contract.[77] Under this contract, Plaintiffs paid Facebook, and, in return, Plaintiffs were entitled to run advertisements on their Facebook page.[78] On June 24, 2020, Facebook sent an email to Plaintiffs, writing that "because [Plaintiffs' Facebook page] ha[d] continually shared content rated false by third-party fact-checkers," Facebook decided to suspend Plaintiffs from running advertisements on Facebook.[79]

Plaintiffs assert in the Amended Complaint that the Lead Stories Article contains several false and defamatory statements that were made with actual malice, constituting the tort of defamation.[80]

Plaintiffs further assert in the Amended Complaint that USA TODAY maliciously decided to publish the USA TODAY Article which purported to fact-check Candace Owens' sarcastic hyperbole in the Second Facebook Post, even though sarcastic hyperbole cannot be fact-checked because it does not deliver any statement of fact.[81] Plaintiffs contend that both Defendants knew that, by improperly

---

[76] *Id.* Ex. A–E.
[77] *Id.* ¶¶ 100–01.
[78] *Id.*
[79] *Id.* ¶ 108.
[80] *Id.* ¶¶ 125–40, 165–89.
[81] *Id.* ¶¶ 64–70.

and wrongfully publishing their articles about Plaintiffs' Facebook posts, Facebook would place warning labels on the posts and would use them to justify banning Candace Owens, LLC from deriving advertising revenue from the Facebook platform.[82]  Plaintiffs claim that, as a result, this conduct by both Defendants constitutes tortious interference with contractual relations.[83]

Plaintiffs further assert in the Amended Complaint that Plaintiffs had recurring, prospective business opportunities with Facebook, where Plaintiffs would pay Facebook to run advertisements on Owens' Facebook page.[84]  Also, Plaintiffs had prospective business opportunities with Facebook users who could buy Owens' book "Blackout."[85]  Plaintiffs argue that Plaintiffs lost these opportunities because of Defendants' wrongful, improper publication of their articles about Plaintiffs' Facebook posts, which led Facebook to place warning labels on the posts and to suspend Plaintiffs from running advertisements, including advertisements about her book "Blackout," on Plaintiffs' Facebook page.[86]  Plaintiffs claim that Defendants' conduct constitutes tortious interference with prospective business relations.[87]

Lastly, Plaintiffs contend that, by wrongfully publishing the articles, Defendants interfered with Plaintiffs' reasonable expectation to enter into and

---

[82] *Id.* ¶¶ 141–49.
[83] *Id.*
[84] *Id.* ¶ 157.
[85] *Id.* ¶ 150–56.
[86] *Id.*
[87] *Id.* ¶ 150–57.

continue a valid business relationship with Facebook, which Plaintiffs claim establishes unfair competition at common law.[88]

## ANALYSIS

### Standard of Review

On a Motion to Dismiss for failure to state a claim upon which relief can be granted under Delaware Superior Court Civil Rule 12(b)(6),[89] the pleading standard is "reasonable conceivability."[90] Under the reasonable conceivability standard, all well-pleaded allegations in the complaint must be accepted as true.[91] Even vague allegations are considered well pleaded if they give the opposing party notice of a claim.[92] The court must draw all reasonable inferences in favor of the non moving party.[93]

However, "[a] claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law."[94] Moreover, the court will not "accept conclusory allegations unsupported by

---

[88] *Id.* ¶ 158–64.
[89] Super. Ct. Civ. R. 12(b)(6).
[90] *K.C. Co., Inc. v. WRK Constr., Inc.*, 2019 WL 338671, at *2 (Del. Super. Ct. Jan. 24, 2019). (citing *Central Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings, LLC*, 27 A.3d 531, 537 (Del. 2011)).
[91] *Spence v. Funk*, 396 A.2d 967, 968 (Del. 1978).
[92] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).
[93] *Id.*
[94] *Tigani v. C.I.P. Associates, LLC*, 228 A.3d 409 (Del. 2020) (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1082 (Del. 2001)).

specific facts," nor will it "draw unreasonable inferences in favor of the non-moving party."[95] Dismissal is not appropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[96] The reasonable conceivability standard asks whether there is a possibility of recovery.[97]

**Defamation with Actual Malice and Defamation with Common Law Malice**
**(Defendant Lead Stories Only)**

Under Delaware law, to state a claim for defamation, a public figure plaintiff must plead that: (1) the defendant made a defamatory statement; (2) concerning the plaintiff; (3) the statement was published; and (4) a third party would understand the character of the communication as defamatory.[98] In addition, the public-figure plaintiff must plead that (5) the statement is false and (6) that the defendant made the statement with actual malice—"that is, with knowledge that it was false or with reckless disregard of whether it was false or not."[99] There is no liability for defamation when a statement is determined to be true or substantially true.[100] In the

---

[95] *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011) (citation omitted).
[96] *Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 238 A.3d 863, 871–72 (Del. 2020) (quoting *In re Gen. Motors*, 897 A.2d at 168).
[97] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs, LLC*, 27 A.3d 531, 537 (Del. 2011).
[98] *Agar v. Judy*, 151 A.3d 456, 470 (Del. Ch. 2017) (citing *Doe v. Cahill*, 884 A.2d 451, 463 (Del. 2005) (en banc)).
[99] *Id.* (citing *New York Times v. Sullivan*, 376 U.S. 254, 280 (1964)).
[100] *Preston Hollow Capital LLC v. Nuveen LLC*, 216 A.3d 1, 9 (Del. Ch. 2019) (citing *Riley v. Moyed*, 529 A.2d 248, 253 (Del. 1987)).

context of a motion to dismiss a libel suit,[101] it is for the court to determine as a matter of law whether the allegedly defamatory statements are protected expressions of opinion, and whether statements of fact are susceptible of a defamatory meaning.[102]

Plaintiffs allege in the Amended Complaint that the following three statements made in the Lead Stories Article are defamatory and false and were made with actual malice:

(1) The [false] claims [about the COVID-19 death counting method] originated in a post . . . published on Facebook by Candace Owens on March 29, 2020.

(2) [The First Facebook Post] is being shared to suggest that medical officials are – in Owens' words – "trying desperately to get the numbers to justify this pandemic response."  This comment is an attempt to downplay the severity of a global infectious disease that has killed more than 42,000 people as of March 31, 2020.

(3) There are several inaccuracies in [the First Facebook Post].[103]

I find no facts alleged in the Amended Complaint supporting Plaintiffs' claim that statement (1) is defamatory or false.  As Lead Stories correctly points out in its brief, Plaintiffs altered the statement and omitted relevant context.[104]  The statement in the original Lead Stories Article, attached to the Amended Complaint as Exhibit

---

[101] *Spence v. Funk*, 396 A.2d 967, 970 (Del. 1978) ("libel is written defamation.").
[102] *Ramunno v. Cawley*, 705 A.2d 1029, 1035 (Del. 1998) (en banc) (citing *Riley v. Moyed*, 529 A.2d 248, 253 (Del. 1987)).
[103] Pls. Am. Compl., ¶ 78 (alteration in original).
[104] Memorandum of Law in Support of Defendant Lead Stories, LLC's Motion to Dismiss, at 24 [hereinafter Lead Stories' Br.].

A, merely reads that "[t]he claims originated in a post (archived here) published on Facebook by Candace Owens on March 29, 2020."[105] In their Amended Complaint, Plaintiffs admit that Owens is the author of the claims published on Owens' First Facebook Post.[106] This statement does not convey any facts that are untrue or capable of defamatory meaning as it does not injure Owens' reputation in any sense.[107]

I further find no facts alleged in the Amended Complaint supporting Plaintiffs' claim that statements (2) and (3) are false under the reasonable conceivability standard. Although Plaintiffs allege that statements (2) and (3) are false, these allegations are negated by the Exhibits A, B and C to the Amended Complaint.[108] Plaintiffs' claim that statements (2) and (3) are false is based on Plaintiffs' assertion that the First Facebook Post is truthful.[109] To support this assertion, Plaintiffs allege that, in the First Facebook Post, Owens linked and referenced an article by renowned U.K. pathologist Dr. John Lee that confirms the

---

[105] Pls. Am. Compl., Ex. A.
[106] Pls. Am. Compl., ¶ 55.
[107] *See Images Hair Sols. Med. Ctr. v. Fox News Network, LLC*, 2013 WL 6917138, at *3 (Del. Super. Ct. Dec. 20, 2013) (citing *Spence v. Funk*, 396 A.2d 967, 967 (Del.1978)) (noting that a statement is capable of defamatory meaning if the statement tends to "injure the reputation in the popular sense").
[108] Pls. Am. Compl., ¶ 55, Ex. A, Ex. B, Ex. D; *see Tigani v. C.I.P. Associates, LLC*, 228 A.3d 409 (Del. 2020) (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1082 (Del. 2001)) ("[a] claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law.").
[109] *Id.* ¶ 56.

accuracy of her First Facebook Post's claim that COVID-19 deaths in the United States are being overstated.[110] Specifically, Plaintiffs state that Dr. Lee explains "precisely why COVID-19 would be potentially overstated as the cause of death."[111] While acknowledging that Dr. Lee's article was referencing the United Kingdom's method for counting deaths (and not the United States), Plaintiffs assert, without support, that "the reporting criteria for cause of death are international: thus, the standards to be followed in the U.K. mirror those in the U.S."[112]

However, Dr. Lee's article, Exhibit B to the Amended Complaint, does not support these assertions.[113] In his article, Dr. Lee stated that because countries calculate cause of death differently, "the data on COVID-19 [deaths] differs wildly from country to country."[114] In fact, Dr. Lee presented that the death rate of COVID-19 in the United States (1.3 percent) is much lower than the rate in the United Kingdom (5 percent) because both countries use different methods when calculating COVID-19 as cause of death.[115] Thus, merely because Dr. Lee argued in his article that the U.K. COVID-19 death recording method may exaggerate COVID-19 deaths,[116] it does not mean that he argued that the U.S. method overstates COVID-

---

[110] *Id.* ¶ 57–58.
[111] *Id.* ¶ 58.
[112] *Id.*
[113] *Id.* Ex. B.
[114] *Id.*
[115] *Id.*
[116] *Id.*

19 deaths. If anything, Dr. Lee's article suggests that reporting criteria for cause of death are not consistent among countries.[117]

Plaintiffs also quote statements from two U.S. health officials, Dr. Deborah Birx and Dr. Ngozi Ezike, in the Amended Complaint to support Plaintiffs' assertion that the First Facebook Post is factually accurate.[118] However, the statement from Dr. Birx only shows that (1) countries have different recording methods regarding COVID-19 deaths, and (2) when a person who has a preexisting condition and COVID-19 dies, medical authorities in the United States count it as a COVID-19 death.[119] Dr. Ezike, another U.S. health official whom Plaintiffs cite in the Amended Complaint, made a point similar to Dr. Birx's statement.[120]

Dr. Birx's statement does not support Owens' statements in the First Facebook Post. In the First Facebook Post, Owens said that "I spent all day today trying to look up daily death rates for any other diseases. You can't get it anywhere. They are reporting ONLY on coronavirus deaths."[121] The quoted statements from Dr. Birx and Dr. Ezike in the Amended Complaint did not say that medical authorities in the United States only count COVID-19 deaths and stop counting other

---

[117] *Id.*
[118] *Id.* ¶¶ 59–60.
[119] *Id.* ¶ 59.
[120] *See id.* ¶ 60 (explaining that when a person with a preexisting condition and COVID-19 dies, the death will be listed as a COVID-19 death).
[121] *Id.* ¶ 55.

causes of deaths.[122]  Nor did the statements from Dr. Birx and Dr. Ezike say that when a person with a preexisting condition who is also positive for COVID-19 dies, only COVID-19 would be listed as the single cause of death on her death certificate.[123]

The Lead Stories Article is not inconsistent with either Dr. Birx' or Dr. Ezike's statements.[124]  Lead Stories did not deny that COVID-19 would be listed on the death certificate if a person who has a preexisting condition and carries COVID-19 dies.[125]  Instead, Lead Stories pointed out in its article that typically the preexisting condition will also be listed as a contributory cause on the death certificate if a person who is positive for COVID-19 dies.[126]  The Lead Stories Article quoted Dr. Sally Aiken's statement that "if [decedents] are positive for COVID-19 and have symptoms, COVID-19 is typically being listed on the death certificate as the cause of death, with their other diseases listed as contributory."[127]

Moreover, the Lead Stories Article revealed inaccuracies in Owens' First Facebook Post.[128]  It pointed out a factual contradiction between what Owens wrote on the First Facebook Post and on her own Tweet that was incorporated into the First

---

[122] *See id.* ¶¶ 59–60.
[123] *See id.*
[124] *See id.* Ex. D.
[125] *See id.*
[126] *Id.*
[127] *Id.*
[128] *See id.*

Facebook Post regarding the number one cause of deaths in the United States.[129]  On the First Facebook Post, Owens wrote "[o]besity is the number 1 killer in America."[130]  In her Tweet, which is incorporated into the same Facebook post, she wrote "[t]he number one killer in America is [h]eart disease."[131]  Then, Lead Stories stated in its article that, according to NBC News (provided with a link to NBC News), CDC does not list obesity as a cause of death and concluded that Owens' claim in the First Facebook Post that obesity is the number one cause of death is not factually accurate.[132]

Thus, Plaintiffs' assertion that Dr. Lee's article supports the truthfulness of Owens' statements in the First Facebook Post are rebutted by the exhibits to the Amended Complaint.  Nor do the statements by Dr. Birx and Dr. Ezike support Owens' statements in the First Facebook Post.  Moreover, in its article attached to the Amended Complaint as Exhibit D, Lead Stories points out factual inaccuracies in Owens First Facebook Post.  Thus, Plaintiffs fail to show that statements (2) and (3) are false under the reasonable conceivability standard.

Plaintiffs also claim in their Amended Complaint that Lead Stories made false statements when it used the terms "Hoax Alert" and "False" in the Lead Stories

---

[129] *Id.*
[130] *Id.* Ex. A.
[131] *Id.*
[132] *Id.* Ex. D.

Article.[133] The phrase "Hoax Alert" was stated right above the heading of the Lead Stories Article as a notice concerning Owens' Facebook Post, and the word "False" was written in a rectangle image partly overlapping the Owens' Facebook post image.[134] For the following reasons, I do not think that Plaintiff's claim that "Hoax Alert" and "False" constitute false statements is well pled under Delaware Superior Court Civil Rule 12(b)(6).

First, Plaintiffs do not demonstrate that the word "False" is an untrue statement under the reasonable conceivability standard. Plaintiffs argue that because the First Facebook Post relied on an opinion from its own expert, Dr. Lee, and Lead Stories relied on an opinion from its own expert, Dr. Ailen, Lead Stories was not able to fact-check the First Facebook Post.[135] This is not accurate. Opinions may carry underlying assertions of facts.[136] Dr. Lee and Dr. Ailen may well have different opinions on whether COVID-19 should be counted as cause of death. However, as discussed above, their underlying factual assertions are not inconsistent. More importantly, in contrast to Plaintiffs' allegations, Dr. Lee's article does not support, much less confirm, the accuracy of Owens' First Facebook Post. Therefore, Plaintiffs fail to demonstrate under the reasonable conceivability

---

[133] *Id.* ¶ 77.
[134] *Id.* ¶ 78, Ex. D.
[135] *Id.* ¶ 132.
[136] *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990) ("expressions of 'opinion' may often imply an assertion of objective fact").

standard that Lead Stories made a false statement when it superimposed the word "False" over Owens' Facebook Post image.

Second, in Plaintiffs' Answering Brief in Opposition to Lead Stories' Motion to Dismiss, Plaintiffs provide the Merriam-Webster dictionary's definition of "hoax" and argue that, by using the words "Hoax Alert," Lead Stories suggested that Plaintiffs were not just mistaken but were purposely lying, and, thus, it is defamatory.[137]

However, in my opinion the term "Hoax Alert" as used in the Lead Stories Article is much like the term "blackmail" as used in newspaper articles in *Greenbelt Cooperative Publishing Association, Inc. v. Bresler*, where the developer plaintiff sued for libel.[138] In *Bresler*, the local newspaper defendant published several articles stating that some people had described the developer's negotiating position in his negotiations with a city as "blackmail."[139] The word appeared several times and was used once as a subheading within a news story.[140] The United States Supreme Court rejected the plaintiff's contention that liability could be premised on the notion that

---

[137] Plaintiffs' Answering Brief in Opposition to Defendant Lead Stories, LLC's Motion to Dismiss, at 23–24 [hereinafter Pls. Answering Br. in Opposition to Lead Stories].
[138] *Greenbelt Co-op. Pub. Ass'n v. Bresler*, 398 U.S. 6 (1970).
[139] *Id.* at 7.
[140] *Id.* at 7–8.

the word "blackmail" implied the plaintiff had committed the actual crime of blackmail.[141] The Court noted that:

> "[i]t is simply impossible to believe that a reader who reached the word 'blackmail' in either article would not have understood exactly what was meant: it was Bresler's public and wholly legal negotiating proposals that were being criticized. No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging Bresler with the commission of a criminal offense. On the contrary, even the most careless reader must have perceived that the word was no more than a rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable."[142]

Moreover, in *Montgomery v. Risen*, the United States Court of Appeals for the D.C. Circuit found that the book-author defendant's description of the plaintiff's software as an "elaborate and dangerous hoax" in his book was merely "loose, figurative, or hyperbolic," and that such language could not serve as a basis for liability in a defamation action.[143] Similarly, the term "Hoax Alert" in the Lead

---

[141] *Id.* at 14–15.

[142] *Id.* at 14.

[143] *Montgomery v. Risen*, 875 F.3d 709, 711 (D.C. Cir. 2017); *see also Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724, 728 (1st Cir. 1992) (finding description of plaintiff's musical comedy as "a rip-off, a fraud, a scandal, a snake-oil job" to be merely "figurative and hyperbolic" and thus protected by the First Amendment); *McCabe v. Rattiner*, 814 F.2d 839, 842 (1st Cir. 1987) (ruling that the word "scam," used in an article regarding a timeshare sales program, is incapable of being proven true or false); *Ayyadurai v. Floor 64, Inc.*, 270 F.Supp.3d 343, 361–62 (D. Mass. 2017) (explaining that "charlatan" used in a loose figurative manner cannot be defamatory); *Metcalf v. KFOR-TV, Inc.*, 828 F. Supp. 1515, 1530 (W.D. Okla. 1992) (noting that statement that a medical organization was a "sham" perpetrated by "greedy doctors" is a matter of opinion); *NBC Subsidiary (KCNC-TV), Inc. v. Living Will Ctr.*, 879 P.2d 6, 11 (Colo. 1994) (en banc) (explaining that statement that a product is a "scam" as a statement of its value is not a defamatory statement).

Stories Article was used as loose, figurative, or hyperbolic language.[144] It is not reasonably conceivable that readers who read the Lead Stories' Article would have understood "Hoax Alert" to mean that Plaintiffs were intentionally spreading a lie. Instead, the readers would have understood "Hoax Alert" as a rhetorical hyperbole implying that the Owens' Post carries inaccurate information and that the readers should proceed cautiously when reading the post.

Since Candace Owens is a public figure, Plaintiffs' defamation claims can only survive a motion to dismiss if allegations in the Amended Complaint support reasonably conceivable inferences that (1) one or more statements in Lead Stories Article are false, and (2) Lead Stories made the statements with actual malice. Plaintiffs fail to show that the statements in Lead Stories Article were false under Delaware's reasonable conceivability standard. Therefore, Plaintiffs fail to state defamation claims against Lead Stories.

### Intentional Interference with Contractual Relations

The contract between Plaintiffs and Facebook is a contract with which tortious interference may occur. Defendants, relying upon *Illominate Media Inc. v. CAIR Florida, Inc.*,[145] argue that no contract actually existed between Facebook and

---

[144] *See* Pls. Am. Compl., Ex. D (not indicating that Plaintiffs lied in the First Facebook Post).
[145] 841 Fed. Appx. 132 (11th Cir. 2020) (per curiam).

Plaintiffs.[146] Facebook's Terms of Service are, not surprisingly, onerous for its users.[147] They do not change the fact, however, that a contract did exist between Plaintiffs and Facebook.[148] Offer, acceptance, and consideration, the *sine qua non* of a contract, are all elements of the relationship.[149]

Delaware courts have adopted the Restatement (Second) of Torts in the context of tortious interference with contractual relations,[150] §766 of which states that:

> [o]ne who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.[151]

Defendants argue that §766 requires a breach of contract in order to state a claim of tortious interference with a contractual relationship, and Facebook did not breach its

---

[146] *Id.* at 136–38; *see* Reply Brief in Further Support of Gannett Satellite Information Network, LLC's Motion to Dismiss the Complaint, 7–15 [hereinafter Gannett's Reply Br.]; Transcript of Oral Argument held on February 24, 2021 (BL-88); Defendant Gannett's Supplemental Letter (Transaction ID: 66376164) [hereinafter Gannett's Letter].

[147] Pls. Am. Compl. Ex. I.

[148] *Id.*

[149] *Trexler v. Billingsley*, 166 A.3d 101 (Table) (Del. 2017) ("A valid contract requires an offer, acceptance, and consideration, and the parties must have intended that the contract would bind them.").

[150] *ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749, 751 (Del. 2010) ("In this context, Delaware courts have consistently followed the Restatement (Second) of Torts, which recognizes a claim for tortious interference with contractual relations where the defendant utilizes 'wrongful means' to induce a third party to terminate a contract.").

[151] Restatement (Second) of Torts § 766 (1979).

contract with Plaintiffs since the contract is an "at-will" contract.[152] Defendants also assert that I should follow *Illominate*, in which the Eleventh Circuit affirmed the district court's dismissal of the plaintiffs' claim that the defendants tortiously interfered with the plaintiffs' relationship with Twitter and Twitter followers.[153] In *Illominate,* the Eleventh Circuit found under Florida law that neither relationship is protected.[154] The court reasoned that, under Twitter's Terms of Service, Twitter can terminate its business relationship with the plaintiffs at any time for any reason.[155] Because the plaintiffs had no legal or contractual rights to the continued use of Twitter, the court found that their contractual rights were not protected.[156]

I disagree with Defendants. First, I do not find any language in §766 that requires breach of contract, as opposed to *interference* with the *performance* of a contract.[157] Moreover, Comment (c) to §766 provides that "[t]he liability for inducing breach of contract is now regarded as but one instance, rather than the exclusive limit, of protection against improper interference in business relations."[158] Comment (g) to §766 provides that "[u]ntil he has so terminated [a contract at will],

---

[152] Gannett's Reply Br., 7–15; Transcript of Oral Argument held on February 24, 2021 (BL-88); Gannett's Letter.

[153] *Illominate Media, Inc.*, 841 Fed. Appx. 132 at 136–38 (11th Cir. Dec.29, 2020); *see* Gannett's Reply Br., 7–15; Transcript of Oral Argument held on February 24, 2021 (BL-88); Gannett's Letter.

[154] *Illominate Media, Inc.*, 841 Fed. Appx. at 136–38.

[155] *Id.* at 137.

[156] *Id.*

[157] *See* Restatement (Second) of Torts § 766 (1979).

[158] *Id.* cmt. (c).

the contract is valid and subsisting, and the defendant may not improperly interfere with it."[159]

Second, in *ASDI, Inc. v. Beard Research, Inc.*,[160] the Delaware Supreme Court found that the defendants tortiously interfered with the plaintiffs' contract with the third party, where the third party could terminate the contract at will.[161] Even though *ASDI* was an "at will" employment contract case, the Delaware Supreme Court clearly explained that "[c]onduct amounting to tortious interference has been found actionable even where the third party is lawfully entitled to terminate a contract at will."[162] The Court did not say that its reasoning applies only to "at will" employment contract cases. Instead, the Supreme Court provided examples of sister state courts' decisions finding actionable tortious conduct that had induced "termination of at will . . . commercial contracts, such as an attorney-client relationship, a marketing contract, and a sawdust supply contract."[163]

In *Travel Syndication Technology, LLC v. Fuzebox, LLC*,[164] the United State District Court for Delaware also found that tortious interference with contractual

---

[159] *Id.* cmt. (g).
[160] 11 A.3d 749 (Del. 2010).
[161] *Id.* at 751–52.
[162] *Id.* at 751.
[163] *Id.* at 751–52 (citing *SliceX, Inc. v. Aeroflex Colo. Springs, Inc.*, 2006 WL 1699694, at *2–3 (D. Utah June 15, 2006); *Lurie v. New Amsterdam Cas. Co.*, 270 N.Y. 379, 1 N.E.2d 472, 473 (1936); *Marks v. Struble*, 347 F.Supp.2d 136, 144 (D.N.J. 2004); *Pure Milk Prod. Co-op. v. Nat'l Farmers Org.*, 64 Wis.2d 241, 219 N.W.2d 564, 574–75 (1974); *Silva v. Bonafide Mills, Inc.*, 82 N.Y.S.2d 155, 156–57 (N.Y.S. 1948)).
[164] 2012 WL 1931238 (D. Del. May 25, 2012).

relations can occur in at will contracts under Delaware law.[165] One of the claims the plaintiff made in *Travel Syndication Technology* was that the defendant wrongfully terminated an at-will service agreement between the plaintiff and the third party.[166] The District Court explained that the defendant failed to understand that whether a termination was legally justified is not the focus of a tortious interference with contractual relations claim; instead, the focus of the claim is whether a wrongful inducement of the termination exists.[167]

However, although Plaintiffs' contract with Facebook is a contract with which interference may occur, Plaintiffs fail to plead that Defendants "improperly" or "wrongfully" interfered with the performance of the contract between Plaintiffs and Facebook under §766 of the Restatement (Second) of Torts, which requires improper interference as an essential element. A tortious interference claim cannot survive if the claim is premised solely on statements that are protected by the First Amendment because the exercise of constitutionally protected speech cannot be an "improper" or "wrongful" action.[168] Because Candace Owens is a public figure, the First

---

[165] *Id.* at *6.
[166] *Id.* at *7.
[167] *Id.*
[168] *See TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1201 (10th Cir.2007) (concluding that as the statements that allegedly caused the tortious interference claim is protected by the First Amendment, the tortious interference claim is not actionable); *Redco Corp. v. CBS, Inc.*, 758 F.2d 970, 973 (3d Cir.1985) (holding that because the statements that allegedly caused the intentional interference claim are protected by the First Amendment, "the intentional interference with contractual relations count is not actionable because there is no basis for finding that their actions were improper").

Amendment protects Defendants' statements unless Plaintiffs' Amended Complaint supports reasonably conceivable inferences that (1) Defendants' articles contain false statements, and (2) Defendants made the statements with actual malice.[169] Defendants' articles are protected by the First Amendment because Plaintiffs fail to state that both Defendants' articles contain false statements of fact made with actual malice under the reasonable conceivability standard.

In the United States Supreme Court's landmark case, *N.A.A.C.P. v. Claiborne Hardware Co.*,[170] the plaintiffs filed claims, among which was "the tort of malicious interference with respondents' businesses."[171] The plaintiffs alleged that their businesses had been damaged because of civil rights boycotts by the defendants.[172] The Supreme Court found that the defendants were not liable in damages for the results of their nonviolent activity protected by the First Amendment.[173] The Court explained that "[w]hile the State legitimately may impose damages for the consequences of violent conduct, it may not award compensation for the consequences of nonviolent, protected activity [by the First Amendment]; only those losses proximately caused by the unlawful conduct may be recovered."[174]

---

[169] *See New York Times Co. v. Sullivan,* 376 U.S. 254, 280 (1964); *Blatty v. New York Times Co.*, 728 P.2d 1177, 1182–84 (Cal. 1986) (en banc).
[170] 458 U.S. 886 (1982).
[171] *Id.* at 889–91.
[172] *Id.* at 888–90.
[173] *Id.* at 915.
[174] *Id.* at 913.

Delaware courts have not addressed the issue of whether tortious interference with contractual relations and prospective business relations are subject to First Amendment limitations. However, courts in other jurisdictions have ruled on this precise matter.[175] For example, in *Blatty v. New York Times Co.*, the Supreme Court of California found in an *en banc* decision that the plaintiff's intentional interference claims failed to overcome First Amendment protections and agreed with the defendant that the plaintiff's intentional interference claims failed to state a claim on which relief could be granted.[176] The court explained that:

> Not only does logic compel the conclusion that First Amendment limitations are applicable to all claims, of whatever label, whose gravamen is the alleged injurious falsehood of a statement, but so too does a very pragmatic concern. If these limitations applied only to actions denominated "defamation," they would furnish little if any protection to free-speech and free-press values: plaintiffs suing press defendants might simply affix a label other than "defamation" to their injurious-falsehood claims—a task that appears easy to accomplish as a general matter . . . and thereby avoid the operation of the limitations and frustrate their underlying purpose.[177]

The Tenth Circuit also has ruled that speech protected by the First Amendment does not constitute "improper" interference under Colorado law, which, like Delaware, follows the Restatement (Second) of Torts in context of tortious

---

[175] *See, e.g., Blatty v. New York Times Co.*, 728 P.2d 1177 (Cal. 1986) (en banc); *Jefferson Cty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc.*, 175 F.3d 848 (10th Cir. 1999); *Unelko Corp. v. Rooney*, 912 F.2d 1049 (9th Cir. 1990).
[176] *Blatty*, 728 P.2d at 1181.
[177] *Id.* at 1184.

interference claims.[178]  In *Jefferson County School District No. R-1 v. Moody's Investor's Service, Inc.*, the Tenth Circuit affirmed the district court's dismissal of the plaintiff's tortious interference claim based on failure to state a claim upon which relief could be granted.[179]  The plaintiff contended that even if the defendant's article constitutes a statement protected by the First Amendment, the First Amendment is not applicable because the plaintiff's intentional interference with business relations and prospective business relations claims are based on the defendant's "conduct"— publication of the article in a newspaper—rather than its speech.[180]  The court rejected the plaintiff's contention that a decision to publish constitutionally protected speech can be regulated by state tort actions for interference with contractual relations noting that the plaintiff's argument is not consistent with the First Amendment principles.[181]  The court found that, first, the defendant's article did not imply false assertion of fact about the plaintiff, which was protected by the First Amendment;[182] and, second, lawful conduct or speech that is protected by the First Amendment is "insufficient to establish the required element of improper conduct" for a tortious interference claim.[183]

---

[178] *Jefferson Cty. Sch. Dist. No. R-1*, 175 F.3d at 856–58.
[179] *Id.* at 857–61.
[180] *Id.* at 851.
[181] *Id.* at 857 (noting that the U.S. Supreme Court concluded that "allow[ing] a plaintiff to establish a tort claim by proving merely that a particular motive accompanied protected speech . . . might well inhibit the robust debate that the First Amendment seeks to protect.")
[182] *Id.* at 857–58.
[183] *Id.*

The Ninth Circuit also explained in *Unelko Corp. v. Rooney*[184] that a tortious interference with business relationships claim is subject to the same first amendment requirements that govern actions for defamation.[185]

In the instant case, Plaintiffs claim that USA TODAY improperly used its "false" fact-check article to place a "false" information warning label on Plaintiffs' Second Facebook Post in order to redirect traffic from Plaintiffs' Facebook page to its own website. To support this claim, Plaintiffs allege that USA TODAY, under its contract with Facebook, maliciously and falsely fact-checked Plaintiffs' opinion or obviously hyperbolic, rhetorical, sarcastic statement, when in fact such statements are not capable of being fact-checked.[186] Plaintiffs argue in their Answering Brief that the tortious interference claim against Gannett is not based on USA TODAY's speech but USA TODAY's wrongful conduct.[187]

I reject Plaintiffs' argument. Even though Owens' statement "nobody is dying of the flu anymore" may be an opinion or a hyperbolic statement as Plaintiffs argue in Amended Complaint,[188] this statement was presented with statistical facts that are objectively verifiable. In the Second Facebook Post, incorporated as Exhibit C,

---

[184] 912 F.2d 1049 (9th Cir. 1990).
[185] *Id.*
[186] Pls. Am. Compl., ¶ 68
[187] Plaintiffs' Answering Brief in Opposition to Defendant Gannett Satellite Information Network, LLC's Motion to Dismiss, at 1–2 [hereinafter Pls. Answering Br. in Opposition to Gannett].
[188] Pls. Am. Compl., ¶¶ 63–65.

Owens stated, "[a]ccording to CDC reports – 2020 is working out to be the lowest flu death season of the decade. 20,000 flu deaths took place before COVID-19 in January, and then only 4,000 deaths thereafter. To give you context; 80,000 Americans died of the flu in the 2019."[189] The USA TODAY Article, which is incorporated into the Amended Complaint as Exhibit E, acknowledges that the statement, "nobody is dying of the flu anymore," is sarcasm.[190] USA TODAY did not fact-check this sarcastic statement in its article.[191] Instead, the USA TODAY Article fact-checked whether the statistical data that Owens used in the Second Facebook Post were true and found that "[a]ccording to CDC data, none of Owens' statistics is correct."[192]

In the Amended Complaint, Plaintiffs fail to allege that any of USA TODAY's statements are factually false.[193] Instead, they merely contend that USA TODAY falsely fact-checked an obvious hyperbole, which is improper interference.[194] Again, I disagree. Owens provided factual statistics in her Second Facebook Post along with her sarcastic comment, and USA TODAY fact-checked the statistics Owens offered in the Second Facebook Post.[195] As the *Blatty* court noted, lawful

---

[189] Pls. Am. Compl., Ex. C.
[190] Pls. Am. Compl., Ex. E (noting that some Facebook and Twitter users "read between the lines of her sarcasm to comment on what she may be implying.").
[191] *See id.*
[192] *Id.*
[193] *See* Pls. Am. Compl.
[194] *Id.* ¶ 69.
[195] *Id.* Ex. C, Ex. E.

conduct or speech protected by the First Amendment is not enough to constitute an essential element of improper interference.[196] As Plaintiffs do not claim that USA TODAY's article is factually false, Plaintiffs fail to plead that the alleged interference is improper as USA TODAY's article is protected by the First Amendment. Plaintiffs fail to plead a claim for tortious interference with contractual relations against Gannett.

Plaintiffs also fail to plead "improper" interference for tortious interference with contractual relations against Lead Stories because, as discussed previously, their allegations against Lead Stories do not show that Lead Stories' article contains any false statements under the reasonable conceivability standard. Therefore, Plaintiffs' claim for tortious interference with contractual relations against Lead Stories must be dismissed under Delaware Superior Court Civil Rule 12(b)(6).

### Tortious Interference with Prospective Business Relations

To plead a claim of tortious interference with prospective business relations, it is necessary for Plaintiffs to plead that the alleged interference was improper.[197] In addition to pleading that the alleged interference was improper, Plaintiffs must plead that "(a) the reasonable probability of a business opportunity, (b) the

---

[196] *Jefferson Cty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc.,* 175 F.3d 848, 856–58 (10th Cir. 1999).
[197] *DeBonaventura v. Nationwide Mut. Ins. Co.*, 428 A.2d 1151, 1153 (Del. 1981).

intentional interference by defendant with that opportunity, (c) proximate causation, and (d) damages."[198]

Plaintiffs allege in the Amended Complaint that, not only did they have a contract with Facebook, but they also had other prospective business opportunities with Facebook.[199] Plaintiffs explain that they had opportunities to prospectively enter into new contracts with Facebook for each new advertisement that Plaintiffs produce and pay Facebook to manage.[200] Moreover, Plaintiffs allege that they had future business opportunities with potential purchasers of Owens' book "Blackout," which was advertised on her Facebook page.[201] Plaintiffs claim that, by publishing the articles which led Facebook to place false information warning labels, Defendants intentionally interfered with Plaintiffs' prospective business opportunities.[202]

However, Plaintiffs fail to plead that Defendants' alleged interference was improper, because the alleged interference was protected by the First Amendment, as discussed above. Therefore, Plaintiffs' claim for tortious interference with prospective business relations against both Defendants must be dismissed based under Delaware Superior Court Civil Rule 12(b)(6).

---

[198] *Id.*
[199] Pls. Am. Compl., ¶ 157.
[200] *Id.*
[201] *Id.* ¶¶ 151–56.
[202] *Id.*

## Unfair Competition at Common Law

To state a common law claim for unfair competition, a plaintiff must allege "a reasonable expectancy of entering a valid business relationship, with which the defendant wrongfully interferes, and thereby defeats the plaintiff's legitimate expectancy and causes him harm."[203] Plaintiffs argue that Owens had a reasonable expectancy of entering into and continuing a valid business relationship with Facebook.[204] As discussed above, there is no "improper" or "wrongful" interference, where Defendants' conduct was protected by the First Amendment. In *Agilent Tech, Inc. v. Kirkland*, the Delaware Chancery Court noted that for an unfair competition claim, it is not wrongful if a defendant's interference is protected by the First Amendment.[205] Moreover, in *Blatty*, the Supreme Court of California affirmed the lower court's judgment dismissing numerous claims including unfair competition as First Amendment limitations are applicable to all of the plaintiff's claims. [206]

---

[203] *Agilent Tech., Inc. v. Kirkland*, 2009 WL 119865, at \*5 (Del. Ch. Jan. 20, 2009) (quoting *Rypac Packaging Mach. Inc. v. Poges*, 2000 WL 567895, at \*8 (Del.Ch. May 1, 2000)).
[204] Pls. Am. Compl., ¶ 159.
[205] *Agilent Techs., Inc.*, 2009 WL 119865, at \*8.
[206] *Blatty v. New York Times Co.*, 728 P.2d 1177 (Cal. 1986) (en banc).

Therefore, Plaintiffs' claim for unfair competition against both Defendants must be dismissed under Delaware Superior Court Civil Rule 12(b)(6).

**CONCLUSION**

For the reasons stated above, I **GRANT** both Defendants' Motions to Dismiss for Failure to State a Claim under Delaware Superior Court Civil Rule 12(b)(6).

This case is dismissed.

**IT IS SO ORDERED.**

/s/ Craig A. Karsnitz

cc: Prothonotary